ARTHUR H. WELLMAN *vs.* GEORGE GRANT CARTER & others.

Suffolk.    November 13, 1933. — May 18, 1934.

Present: CROSBY, PIERCE, FIELD, DONAHUE, & LUMMUS, JJ.

*Probate Court,* Jury issues, Appeal. *Will,* Validity. *Unsound Mind. Undue Influence. Devise and Legacy,* Validity, Residue. *Words,* "Person aggrieved."

At the hearing of a motion, by next of kin contesting a petition in a probate court for proof of the will of a woman made about two years before her death in her eightieth year, for a jury issue as to her soundness of mind, a statement of expected evidence by counsel for the contestants was in substance to the effect that she was forgetful, was subject to delusions, had certain minor eccentricities, had occasional "tantrums" about trivial matters, could not carry on a connected conversation, and made inordinately large tips, gifts, and purchases; and that psychiatrists, considering such facts, but not considering many other facts concerning the testatrix which were stated in behalf of and were favorable to the proponent, would give their opinions that she did not have testamentary capacity at the time when the alleged will was made. That instrument, which disposed of a large amount of property and whose general scheme of distribution was the same in substance as in several previous instruments executed over a period of nearly thirty years before her death, did not indicate mental incapacity in itself. A statement of expected evidence by counsel for the proponent was in substance to the effect that attending physicians of the testatrix would testify to an absence of any facts indicating insanity and that she was normal and intelligent; that testimony by her friends and others, some of whom were entirely disinterested with respect to the controversy, would show that she was intelligent, bright, a patron of the arts and interested in many forms of activities, in current events and in life generally; that the recipients of her large tips and gifts had been employees and intimate friends of hers for many years; and that she kept in mind the general extent and nature of her property and the persons in whom she was interested, and followed her investments and business affairs closely and intelligently. The motion was denied. *Held,* that there was presented no substantial issue of fact on which the contestants could reasonably base an

expectation of success in a trial before a jury; and that the motion properly was denied.

It *was stated* that ordinarily it would be proper for a jury to decide the issue, whether an aged woman, who for many years had had close and confidential relations with an attorney, and who had executed, without having the benefit of independent advice, a will drawn by the attorney and containing large bequests to him and members of his family and others and only comparatively small bequests to her next of kin, had been subjected to undue influence by the attorney in connection with the will.

In the circumstances, a single woman of advanced years and large means, who in her will gave the bulk of her property to her attorney and members of his family, and to servants, friends and institutions, giving only comparatively small sums to cousins who were her next of kin and in whom she had little interest, could not properly have been found to have been subjected to undue influence in giving the residue to a museum to which she had made a gift in another will executed nearly thirty years previous to her death; to a religious association, with one of whose churches she was closely connected and to which she had made a gift in a previous will; to a hospital to which she had made a gift in a previous will; and, in substitution for an educational institution to which gifts had been made in previous wills, to a college from which had graduated her attorney, who prepared the will, was named executor thereof and had been a close friend and confidential adviser of the testatrix for many years.

Mere opportunity in a certain person to exercise undue influence upon one, the proof of whose will is opposed on the ground that it was procured to be made by undue influence exercised by such person, is not sufficient to require the granting of a motion for the framing of a jury issue as to such undue influence.

Upon appeal from a decree of a probate court denying a motion, by next of kin contesting a petition for proof of a will, for jury issues as to undue influence alleged to have been exercised upon the decedent by certain legatees, it appeared that the contestants were not residuary legatees, that, upon statements of expected evidence by counsel, upon which the motion was heard, the residuary legacies could not rightly be found to have been procured to be made by undue influence and must be found to be valid, that some of the residuary legatees appeared at the hearing on the motion and requested that the alleged will be admitted to probate in its entirety, and that the other residuary legatees did not appear nor oppose proof of the alleged will. *Held,* that

(1) Only such parts of the will as should be proved to have been procured to be made by undue influence should be set aside on that ground;

(2) If the legacies questioned should be proved to have been procured to be made by undue influence, and therefore to be void, they would fall into the residue, the gifts of which must be found to be valid; the circumstance, that the residue thereby would be increased in value beyond what was contemplated by the decedent, would be immaterial;

(3) The contestants, in the circumstances, had no standing to contend that the legacies in question were invalid by reason of undue influence;

(4) The contestants were not persons "aggrieved" by the decree within the meaning of G. L. (Ter. Ed.) c. 215, § 9, and had no standing to prosecute the appeal;

(5) The decree must be affirmed.

Upon appeal from a decree of a probate court denying a motion, by next of kin contesting a petition for proof of the will of a single woman of· advanced age and large means, for jury issues as to whether certain legacies in the alleged will were procured to be made by undue influence, it *was stated* that the record did not show undue influence with respect to

(1) A legacy in a substantial amount given to a young man whose mother had long been a friend of the decedent and who himself for several years had spent most of his spare time in constant attendance upon her and had been on terms of great intimacy with her; letters from him to her, containing flattery and some expressions which might be regarded as. undignified, exaggerated, lacking in good taste and as written with a view to his profiting thereby;

(2) Substantial legacies to a husband and wife who were members of a family which had been intimate with the decedent and her family for many years and other members of which were also legatees under the will, and who had been the recipients of liberal gifts and assistance from the decedent during her life time; no undue influence was shown by the fact that their legacies in the will in question were larger than in previous wills, the decedent's property and income having increased considerably since the times when the previous wills were made, nor by letters from the husband to the decedent which, although fulsome, exaggerated and lacking in dignity, might be thought to be justified by his feelings of gratitude toward her.


PETITION, filed in the Probate Court for the county of Suffolk on January 23, 1933, for proof of the will of Nellie P. Carter, late of Boston.

Certain next of kin of the decedent filed the motion for jury issues described in the opinion. The motion was heard by *Dolan*, J., upon statements by counsel of expected evidence, and was denied. The contestants appealed. Material portions of the statements by counsel, which were reported, are described in the opinion.

The case was argued at the bar at the sitting of the court in November, 1933, before *Crosby, Pierce, Donahue,* & *Lummus*, JJ., and afterwards was submitted on briefs to *Field*, J.

*R. T. Bushnell,* (*J. G. Bryer & T. L. Thistle* with him,) *& W. G. Thompson,* for George Grant Carter and others.

*D. E. Hall,* (*P. N. Jones & B. C. Perkins* with him,) for the petitioner.

*P. Ketchum,* for Cora Lee Webber and others.

*C. P. Curtis,* for James Trimble Brown and another.

*P. A. Atherton,* for Proprietors of Arlington Street Church.

CROSBY, J. This is an appeal by the contestants, who are five of ten first cousins and next of kin of the late Nellie Parney Carter, from a decree of the Probate Court denying their motion for the framing of jury issues in respect to the execution of an instrument offered for probate as the will of said Nellie Parney Carter. The issues sought are as follows: "1. Was the instrument purporting to be the last will of said Nellie Parney Carter, dated April 8, 1931, executed according to law? 2. Was the said Nellie Parney Carter at the time of the execution of the said alleged will of sound mind? 3. Was the execution of said alleged will . . . procured by the fraud or undue influence of Arthur H. Wellman, Sargent H. Wellman, Mary MacFarlane, Joseph Daniels Leland, James Trimble Brown, Elsa Tudor Leland, or any of them, exercised upon the said Nellie Parney Carter?" The first issue need not be considered as no question is now raised respecting the execution of the instrument.

Miss Carter was a maiden lady who resided in Boston all her life and died January 15, 1933, in her eightieth year. The cause of death was coronary thrombosis. Her father died in 1897. Upon her mother's death, in 1904, Miss Carter inherited a substantial amount of property from her father's estate. She inherited additional property from an older sister who died in 1912. A brother died in 1870. She thus became the last of three children. Her property increased considerably and in 1930 reached a value of over $7,000,000. At the time of the execution of the instrument offered as her will, the value was over $4,600,000. This instrument leaves $3,983,000 to seventy-six beneficiaries, and the residue, of the then value of about

$150,000, to four institutions including the Boston Museum of Fine Arts and Amherst College.

Arthur H. Wellman, Esquire, who is the proponent of the instrument offered for probate, is named as the sole executor. He had been Miss Carter's attorney and adviser since 1910, and was left $500,000. He is named in the motion for jury issues. His wife, Jennie L. Wellman, was left $100,000. His son, Sargent H. Wellman, who is associated with his father in the practice of law and is also named in the motion, was left $100,000, and other members of the Wellman family were left sums amounting to about $160,000. Mr. Wellman's secretary, Mary MacFarlane, who appears to have performed many services for Miss Carter, was left $150,000, and is also named in the motion. Members of the Leland family, with which it is stated in the offer of evidence Miss Carter and her family had been on terms of intimacy since 1872 or 1873, were given bequests in the amount of $1,190,000, included therein being bequests of $200,000 each to Joseph Daniels Leland and Elsa, his wife, named in the motion. James Trimble Brown, also named in the motion, is the son of an old friend of Miss Carter; this friend is given $50,000, and Brown, between whom and Miss Carter close personal relations existed, is left $100,000. Servants and attendants upon Miss Carter were generously remembered, in some instances receiving $100,000. Bequests amounting to $345,000 were left to various charitable and educational institutions. The sum of $5,000 was left to each of the ten first cousins living at the time of Miss Carter's decease. The seventy-third article of the instrument provided that if any person named as a legatee should oppose the probate of the instrument or should in any way object to its validity as a will, the legacy to such person would be revoked.

The first question to be considered is the sanity or mental capacity of the decedent. The principles governing the action of a judge of probate in passing upon such a motion were fully set forth in *Fuller* v. *Sylvia*, 240 Mass. 49, 53, and the question before this court on an appeal from a denial of a motion for such an issue heard upon statements

of counsel has recently been stated in *Cranston* v. *Hallock*, 281 Mass. 182, and need not here be repeated. Having these principles in mind we consider the statements of counsel as to expected evidence. Counsel for the contestants stated that "eminent psychiatrists," named to the judge, would testify that in their opinion the decedent was insane and could not have possessed testamentary capacity at the time of the execution of the instrument. This opinion was based on various matters expected to be proved in court in connection with the decedent's mentality, namely, that she was extremely forgetful respecting many things; that she attempted to pay bills that previously had been paid; that she kept large sums of money and uncashed refund checks in her suite; that after an automobile accident, in 1924, she had little or no memory of the details respecting it; that she had delusions that persons outside her windows were in collusion with her maid conspiring to rob her; that she was so apprehensive of being burned to death that she never would go to bed; that she was afraid that her coffee at the hotel where she lived would be tampered with. The alienists also considered it important that she made purchases alleged to be not in harmony with her dress and bringing up, and purchases of thousands of dollars worth of clothing, laces, playing cards, picture books, trinkets and jewelry, many of them being placed in storage without being used; the collecting of purchases never used, and of no historic or other value, representing to the alienists the impulses of a disordered mind. It also was stated that she made very large tips, and gifts to a group of sycophants out of proportion to any service they could have rendered, which showed a lack of judgment or delusion to compensate for a feeling of inferiority; that her spending, which might be termed excessive and unreasonable, and her large annual income contrasted with her insistence on various occasions that she had little or no money, and in connection with other factors showed a diseased mind. There was offered as further evidence of mental disorder that over a long period of time she would occasionally go into a fit of "tantrums,"

her mind dwelling for hours on a trivial subject, including a berating of her sister Lizzie when living; that she was subject to moments of confusion; that she could not comprehend the simplest incident; that she talked in monosyllables and would not carry on connected conversation; that her apartment contained odd and miscellaneous pieces of furniture, was in confusion, and basketfuls of stock quotations were cut out and saved without order or sequence, and were of no use to anyone. Certain other offers of evidence made by counsel for the contestants have been considered but need not be referred to.

The proponent's statement of evidence which he proposed to offer presented an entirely different picture of the mental condition of the decedent. She was represented as a "well and sturdy New Englander," possessed of a sound mind and good intelligence, somewhat shy, but extremely fond of a small circle of friends to whom it pleased her to make generous gifts, and substantial financial support; and as a patron of the arts, and an admirer of beautiful things. These various elements were not presented to the psychiatrists whom the contestants proposed to call as witnesses when forming their opinion that the decedent lacked testamentary capacity. They did not have before them all the facts concerning the decedent which might have been found to be true. Their opinion was subject to the infirmity pointed out under analogous circumstances in *Taylor* v. *Creeley*, 257 Mass. 21, at pages 26 and 27, where it was said: "The question stated and assumed as true only the facts consonant with the answer desired, and it omitted other facts which were practically admitted by the contestants and which, if stated, might well have led to a different answer. . . . The jury should have been instructed that the answer should be given no weight as evidence of the mental condition of the testator at the date of the execution of the will unless they found all the facts therein assumed to be true." See also *Wellock* v. *Marsh*, 277 Mass. 416. Further referring to expected evidence which the proponent was ready to present, it was stated that during the years prior to and subsequent to

the execution of the instrument the health of the decedent was generally very good; that in 1926 she was visited once or twice by a physician for treatment for a heavy cold, and in 1930 she had bladder trouble, due to a large abdomen, which required medical attention. In 1931 she fell and called Dr. Brackett, an orthopedic surgeon, who continued to visit her a number of times to adjust an abdominal support. He visited her on the day before the execution of the instrument. She intelligently discussed a subject of common interest, and her reasoning faculties "were perfectly all right." In July, 1932, she was attended by Dr. David Cheever for an attack of indigestion. This was her last medical attention until her final illness in 1933. During all this time there is no evidence of any disease which would be likely to affect or disturb her mental condition. In her last illness, beginning January 10, 1933, she was cared for by Dr. Denny. He found she was suffering from coronary thrombosis. It is stated that he would testify that on that date "she was undoubtedly of sound mind; that she talked intelligently; was entirely coherent and able to describe her condition accurately"; that between January 10 and January 15, the day she died, he called upon her several times each day, and it was only toward the end that she talked incoherently. Probably the only illness of any importance was an ill turn on December 4, 1931, when Dr. Brackett attended her. This was explained by Dr. Cheever in a letter to the decedent as due to a slight hardening of the arteries. Each of the physicians hereinbefore referred to, including the one attending her in her last illness, would testify that at all times she was perfectly normal and intelligent except shortly before her death. A large number of friends and others who knew her would give similar testimony.

Even if these witnesses could not express their opinion as to her mental condition, they could properly testify to the absence of facts indicating insanity. *Old Colony Trust Co.* v. *Di Cola,* 233 Mass. 119, 125. The opinion of Dr. Cheever was corroborated by his letter of July 12, 1932, written to Miss Carter. It was such a letter as would be

written to a normally intelligent person capable of understanding and following certain rules for the promotion of her health. The expected evidence of the physicians and friends hereinbefore referred to would show that the decedent was a woman far different from a person without memory, who was confused, "couldn't comprehend the simplest incident . . . talked mostly in monosyllables and . . . wouldn't carry on connected conversation." Persons who had no interest in the outcome of this litigation were willing to testify that at social gatherings she was a bright, intelligent woman who was much interested in current events. A member of the Boston bar stated in a letter that he had known the decedent since 1915 and had always "found her keen, bright and wide awake; she was keenly interested in the Art Museum, life generally, current events, and individuals, and all the activities of her friends . . ." She indulged in many social activities, including the theatre, dinners and luncheons, cards, football games, army aviation maneuvers, visits to friends, automobile excursions, and took an active interest in Japanese art, and in the Boston Museum of Fine Arts. Although it was stated by counsel for the contestants that she bought many "trinkets" for the proponent, it was stated that she made extensive purchases of works of art, many of which were presented to the Boston Museum of Fine Arts.

In reply to the expected evidence to be produced by the contestants that she gave large tips to servants and others, the proponent's expected evidence was to the effect that the largest gifts to servants were to those who had been in her employ many years; that as to gifts to others it gave her great pleasure to make gifts to members of a small group of intimate friends. In connection with the offer of evidence that the large expenditures she made showed mental incapacity to make a will, it is to be borne in mind that she had a very large annual income, with no dependents, and being practically alone she felt free to expend her money as she pleased. As to her first cousins, her next of kin, with slight exception, they had no family or friendly contact with her. The gifts were either to friends of long standing,

or to other friends with whom an intimacy had developed in part because of previous family friendships, and in part by reason of mutual attraction. She had little need in view of her large income to be economical and sparing in her expenditures. The recipients of gifts, both servants and friends, were in general made beneficiaries under the instrument which was executed as her will. The instrument itself does not indicate mental incapacity. Apart from changes in the proportions given to charity compared with those given to friends, and changes in the amounts given to various beneficiaries, and except for the omission of persons who died in the interval, the general scheme of distribution of her property was substantially the same as that in several previous instruments beginning in 1904. The proponent offered testimony which had a tendency to show that she was not forgetful as to matters about which she would naturally remember. There were other offers of evidence which tended to show that she kept in mind in a general way the nature and extent of her property; that she followed closely her investments and read financial newspapers; that she wrote intelligent letters to Mr. Wellman, her counsel, respecting stocks, bonds, dividends, and deposits made by him in her bank account, and that she had knowledge of and was interested in her affairs previously to and at the time she executed the instrument as her will. The proponent's offer of testimony was to the effect that she was a woman who was able to keep in mind in a general way the nature and extent of her property and those in whom she was interested, and she desired to remember in her will, and that she was free from any delusions which were likely to cause her to dispose of her property differently from what she would have done if not subject to mental infirmity.

We are of opinion that upon the entire offer of testimony by the contestants in connection with the offer of testimony by the proponent, there is presented no substantial question of fact on which a reasonable expectation of success could be based in a trial before a jury. Although there were offers of evidence that she had delusions as to

a conspiracy to rob her and attempts to tamper with her coffee, and tantrums as to trivial matters, there was abundant evidence that the usual course of her life was sane and intelligent. It was said in *Taylor* v. *Creeley,* 257 Mass. 21, 29, 30: "There was no evidence of delusions affecting the disposition of the property. There was a presumption of sanity to be weighed with the evidence in testamentary cases. . . . Against this was evidence of many acts of temper, irritation, momentary feebleness, lapses of memory, failure of recognition, carelessness in dress and neglect of person . . . and the opinion of medical experts based upon a hypothetical question which omitted many important facts treated as true throughout the trial, that the man characterized by the question was not of sound mind. None of this shows lack of testamentary capacity." If the decedent in the case at bar suffered from delusions, none of them was entertained with respect to a person having a claim upon her bounty. A person "of pathologically unsound mind may possess testamentary capacity at any given time and lack it at all other times." *Daly* v. *Hussey,* 275 Mass. 28, 29, and cases cited. The decedent's postponement of payment of a small bill, and various forms of vaguely expressed convictions of poverty are no more than minor eccentricities, ·in view of the other evidence offered as to her ability to understand, in a general way, the nature and extent of her property, and to carry in her mind the persons who would naturally have some claim to her remembrance.

We are of opinion that the statement of counsel for the contestants of expected evidence would not have warranted a finding that the decedent was of unsound mind when the instrument in question was executed. *Johnson* v. *Talbot,* 255 Mass. 155, 158. *McIntosh* v. *McIntosh,* 263 Mass. 315, and cases collected at page 318. *Cranston* v. *Hallock,* 281 Mass. 182. It follows that the judge of probate properly denied so much of the motion as related to the framing of an issue for a jury trial respecting the decedent's mental capacity to make the instrument in question.

The question of undue influence is now to be considered.

Arthur H. Wellman was named as executor of the instrument — the lawyer who drew it and through whom it was executed. He and members of his family were the recipients of large bequests. The decedent was a person of advanced years; she had long and close confidential business relations with the attorney and she acted without independent advice. She had near kindred who received only slight remembrances in the instrument. It was said in the recent case of *Tarr* v. *Vivian*, 272 Mass. 150, at page 153: "When a person of advanced years, having near kindred but no children, through an attorney at law with whom he is personally intimate and has important and confidential business relations but who is not a kinsman, executes an instrument as a will without independent and disinterested advice, whereby a small fraction of his estate is given to his next of kin and to charity and the residue of it to the attorney at law and his family, the law views the transaction with considerable jealousy. Slight additional circumstances indicating susceptibility to influence on the part of the alleged testator, or dominating power on the part of the attorney, would support a finding of undue influence. The relation of attorney and client is in any event highly confidential and fiduciary, and business dealings between them are discouraged by the policy of the law. . . . The attorney is held to a conspicuous degree of fidelity and is forbidden to take any personal advantage of his client." Although there is no presumption of undue influence on an attorney's part, yet in view of the jealous scrutiny to which the law has thought it wise to subject transactions of this kind it is proper that ordinarily an investigation by a jury be had.

The intent of the decedent to benefit the institutions named in the residuary clause is not subject to any indication of undue influence. A gift to the Boston Museum of Fine Arts was made as far back as 1904 when, by an instrument executed as her will, she made a gift to that institution. An interest in the American Unitarian Association, first mentioned in the instrument of 1922, was natural in view of the decedent's close connection with the

Arlington Street Church. There is nothing to show that the bequest to the Boston Dispensary, first mentioned in the instrument of 1925, was other than what it purports to be, namely, a full expression of the decedent's desires. As to the bequest to Amherst College, which was in substitution of a bequest made to the Massachusetts Institute of Technology, it appears there was a gift to the latter institution in the instruments of 1904 and 1912. Mr. Wellman was a graduate of Amherst College, and the bequest by its original terms was to establish a permanent fund to be known as the "Arthur H. Wellman Fund." There was nothing in this bequest to show any interest of personal monetary gain, although it might be argued that personal pride on the part of Mr. Wellman was involved. However, there is no sound ground for an inference that by his undue influence the decedent was forced to substitute Amherst College for the Massachusetts Institute of Technology when her real wish was to benefit the latter institution. There is no evidence of near next of kin of close ties, and for whom the decedent felt affection, being subsequently omitted. In view of the personal relations between the decedent and Mr. Wellman and his family it is just as likely that she suggested that the fund should bear his name. Any conclusion of undue influence in connection with the residuary bequest to Amherst College could rest solely upon conjecture, which is not sufficient to sustain such a conclusion. *Neill* v. *Brackett,* 234 Mass. 367, 370. Mere opportunity to exert undue influence is not enough to warrant the framing of a jury issue on that question. *Johnson* v. *Loring,* 267 Mass. 310, 312. A theory that the residuary clause was procured by undue influence cannot be supported on any sound ground.

It is plain from the offers of expected evidence that the decedent had little interest in or affection for her first cousins. As the residuary bequests are valid, the next of kin cannot complain of any invalidity of the bequests to the other legatees. On the issue of undue influence they have no standing in this court with respect to those legacies. The general rule is that a residuary bequest of per-

sonal property includes void legacies, lapsed legacies, and anything that is not legally disposed of so as to pass to the person intended as the object of the testator's bounty. *Thayer* v. *Wellington,* 9 Allen, 283. *Casey* v. *Genter,* 276 Mass. 165, 170. It was decided in *Carothers's Estate,* 300 Penn. St. 185, that a bequest alleged to have been procured by undue influence would fall into the residue if set aside, and that therefore where the will contained a residuary clause, the next of kin was not a "person aggrieved." By G. L. (Ter. Ed.) c. 215, § 9, only a "person aggrieved" may appeal from an order or decree of the Probate Court. So far as here material for a person to be aggrieved his pecuniary interests must be affected. See *Murray* v. *Massachusetts Bonding & Ins. Co.* 283 Mass. 15. Where a person who is not aggrieved has appealed, the decree below may be affirmed. *Delaney* v. *Cook,* 256 Mass. 203.

It follows that the decree of the Probate Court is to be affirmed so far as it refuses an issue of undue influence on the part of any of the persons named. That the residuary clause, where separate, distinct and independent, may stand, even if the bequests to such persons were procured by undue influence, is established by the holding that only parts of the instrument affected by the undue influence of a named person are to be set aside. *Blinn* v. *Pillsbury,* 252 Mass. 197, 205. See *Rowe* v. *Collamore,* 238 Mass. 15, 19. That the residuary clause would be increased in value beyond what was contemplated by the decedent would be immaterial. *Thayer* v. *Wellington,* 9 Allen, 283, 298. There are eleven different bequests to charitable, religious and educational institutions of a total of $345,000 unaffected by any suggestion of undue influence. Many bequests to relatives and friends amount to a large sum. The charge that Mr. Wellman procured the bequests to members of the Leland family and to several servants and to others in close relations with the decedent in order to conceal knowledge which they had concerning the decedent's mentality, and to conceal from her a design on his part to get her money, is without evidence to support it. The Lelands and some of the servants then known by the

decedent were remembered in the instrument executed by her in 1904. This was several years before Mr. Wellman knew her. The increase in the amounts is as consistent with an increase of regard and affection and the increase in the decedent's fortune as it is with a design on Mr. Wellman's part of the character suggested.

The relations for many years between the Leland family and Miss Carter were sufficient to account for the increases in amounts given to them. The offer of expected evidence would not warrant a finding of undue influence on the part of either Joseph Daniels Leland or Elsa Tudor Leland.

The offer of expected evidence made by the contestants for an issue of undue influence on the part of Sargent H. Wellman or of Mary MacFarlane is without any reasonable ground to support it.

No substantial basis was presented for charging James Trimble Brown with undue influence. The close association of Brown with the decedent began in 1930, and the bequest to him was largely increased over what had been fixed in the instrument drawn in 1929. The bequest itself furnishes a sufficient motive, and he had an opportunity to exercise undue influence, although these two factors alone would not warrant a finding of undue influence. The circumstances warrant the conclusion that Brown was very attentive to the decedent and that she derived much happiness from her association with him. It has been held by this court that a decree denying issues was to be affirmed where there was an offer of evidence that a person substantially benefiting under the will had merely an opportunity to exercise a dominating influence over the testatrix. *Cummins* v. *McCawley*, 241 Mass. 427. The contestants offered to prove that Brown had access to the decedent's room, and the day after her death he assembled a collection of miscellaneous papers, letters and envelopes which he later burned. His counsel stated that his client would deny there were any letters or papers; that what was burned was merely rubbish. Counsel for the contestants stated that he possessed evidence to the contrary. If the jury found that Brown burned letters and papers belonging to

the decedent they might properly draw an inference that the letters and papers contained evidence unfavorable to him. See *Sullivan* v. *Sullivan,* 188 Mass. 380; *Matter of Eno,* 196 App. Div. (N. Y.) 131, 163. The letter from Brown's counsel might be construed as an offer of evidence explaining the transaction as entirely innocent in character, although the witnesses referred to were substantial beneficiaries under the instrument and might not stand disinterested as to Brown. If an issue were submitted to the jury and it was found that the decedent never intended to make Brown a beneficiary under her will, the contestants would not benefit by such a finding as the amount of the legacy so given to him would pass to the residuary legatees.

The contestants' statement of expected evidence also was, in substance, that Brown's protestations of affection for the decedent and his attentions to her, hypocritical as the jury might find them to be, warranted a finding of fraud or undue influence. It appeared that Brown's mother had long been a friend of the decedent, and the latter sent presents to Brown when he was a boy in school, and she was interested in his training to be an army officer. In 1930 he was assigned to duty in Boston, and he wired Miss Carter for assistance in obtaining hotel reservations as they were difficult to secure at that time. He was invited to occupy a spare room in her suite. The friendship between them thereafter became close and intimate. In 1931 they lived at the same hotel in Boston, and he received a substantial monthly income from her. Although he was under thirty years of age and many years her junior, he spent most of his time outside his military duties in constant attendance upon her. His counsel suggests that his activities might be characterized as those of a social secretary. Counsel for the contestants lays much stress on letters which Brown would send to her containing flattery and hypocritical protestations of affection. It would not seem that in general "flattery" can be considered as a means of gaining undue influence. It cannot be said that has a tendency to cause a testator to do anything except what he exactly wants to do. On the other hand "undue

influence" is "whatever destroys free agency and constrains the person whose act is under review to do that which is contrary to his own untrammelled desire." *Neill* v. *Brackett*, 234 Mass. 367, 369. Flattery may possibly be an indirect method of getting a testator to mention a person in his will, but it cannot be regarded as undue influence as that phrase is commonly used and understood. A direct method to attain the same end is the use of importunity or solicitations. They are permitted. Some influence may be exercised upon a testator by a legatee which is not undue. *Bacon* v. *Bacon,* 181 Mass. 18. *Smith* v. *Keller,* 205 N. Y. 39, 44.

It is well established that "fraud" and undue influence are separate and distinct grounds for invalidating a testamentary provision, in the one case the testator proceeding of his own free will but affected by a false representation of a fact which is the inducement for the disposition in question, and in the other the testator's own will and free agency being destroyed so that what he does he is constrained to do contrary to his own free will. See Page on Wills (2d ed.) § 181; 28 Am. L. R. 787, 792, and cases cited. Although some of the expressions in Brown's letters to the decedent might be regarded as undignified, exaggerated, and lacking in good taste, and as written to cultivate the friendship of Miss Carter with a view to profit thereby, it cannot be held that they were evidence of fraud or undue influence. It is not for such acts that the law sets aside a testamentary disposition in favor of the person conducting himself as thus described.

As for Joseph and Elsa Leland it is plain that the contestants' offer of expected evidence would not warrant a finding of undue influence. In other words there was no constraint of the decedent to do what was contrary to her own desires. Whether her mentality was naturally strong as could be found from the offer of evidence of disinterested persons that she had a sound, intelligent mind and one difficult to influence, or whether it was weak in comparison with the alleged superiority of the Lelands, there is no substantial evidence that her liberal *inter vivos* gifts

to them were procured by wrongful constraint. Only a few instances of solicitation are shown and the contestants have failed to show that they resulted in success in any particular instance. On the other hand, a letter from the decedent to Joseph Leland in 1921 requested that bills of his indebtedness be sent to her for payment. It also appears that a request made by Elsa Leland to the decedent in 1931, a few months after the execution of the instrument in question, for $10,000 did not meet with success. Her check book showed that the gifts to the Lelands ceased in 1932. The gifts and testamentary dispositions to all the Lelands were natural in view of the long friendship between the Carters and the Lelands. Miss Carter knew Joseph Leland's mother as early as 1872 or 1873, and had given her $75,000 in the instrument, and there was an offer of expected evidence of intimacy between the two families which had existed for many years. It further appears that all the Lelands mentioned in the instrument here in question who were known to Miss Carter in 1904 were mentioned in the instrument of that date. Others were added in later instruments of the decedent after they became members of the Leland family either by birth or by marriage. Although these amounts were largely increased subsequently it is to be remembered that the decedent's fortune and income therefrom had grown enormously; besides, substantial bequests to persons who had died before the execution of the instrument in question were not required to be paid. The assertion in the contestants' brief that some inference of undue influence may be drawn from the increases in the Lelands' bequests and the decreases in amounts to various charities is not sufficient ground for the submission of an issue of undue influence to a jury. We are of opinion that without other evidence this fact is of little if any significance. There is no reasonable ground to conclude from their letters and actions alone that their expressions of affection were intentionally false. Miss Carter's generosity to them gave them every reason to entertain and express feelings of gratitude and high regard for her. Although

some of the expressions used by Joseph Leland in letters to the decedent may be thought to be fulsome and exaggerated and lacking in dignity, it cannot reasonably be contended from this alone that what he stated was wilfully false. In favor of their genuineness is the fact that he had great cause to be moved to an expression of feelings of gratitude. The expressions of Elsa Leland in letters to the decedent are not matters for the consideration of a jury on the question of undue influence. She had as much cause for gratitude as her husband.

In deciding whether issues for a jury should be framed it must appear from the statements of counsel that there is sufficient ground for a reasonable expectation of a result favorable to the party requesting the framing of issues. There must be some evidence of a substantial nature to support the contention of the contestants. For the reasons already stated we are of opinion that there was no sufficient offer of expected evidence to warrant a finding that the decedent was not of sufficient mental capacity at the time the instrument in question was executed to make a valid will.

No issue upon the question of undue influence on the part of Arthur H. Wellman need be submitted to a jury, for the reason hereinbefore stated that the residuary bequests are valid and cannot be set aside. The case is to be decided in accordance with the rules of law stated in *Fuller* v. *Sylvia*, 240 Mass. 49, *Johnson* v. *Talbot*, 255 Mass. 155, *Casey* v. *Genter*, 276 Mass. 165, 170, and cases there cited. The residue goes to the residuary legatees who are not parties to this contest. On this issue the contestants, who are next of kin, have no standing in this court in respect to these legacies. "Unless some other purpose is expressed in the will a void or lapsed legacy falls into the residuum of the estate." *Casey* v. *Genter*, 276 Mass. 165, 170, and cases cited. *Thayer* v. *Wellington*, 9 Allen, 283, 298. *Carothers's Estate*, 300 Penn. St. 185. Only a "person aggrieved" may appeal from an order or decree of the Probate Court. G. L. (Ter. Ed.) c. 215, § 9. *Crowell* v. *Davis*, 233 Mass. 136, 139. The

residuary legatees named in the instrument are the Museum of Fine Arts of Boston, the Trustees of Amherst College, both of which appeared in the Probate Court at the hearing on the motion for issues and requested that the proposed instrument be sustained in all particulars, and the American Unitarian Association, of Boston, and the Boston Dispensary, which legatees did not appear or offer opposition to the instrument or its probate, or support the application for jury issues.

A majority of the court are of opinion that the decree of the Probate Court denying issues must be affirmed.

*Ordered accordingly.*