LILLIAN J. FRAWLEY *vs.* LILLIAN M. SNELL & others.

Essex.    January 6, 1938. — February 2, 1938.

Present: RUGG, C.J., DONAHUE, QUA, DOLAN, & COX, JJ.

*Probate Court,* Jury issues.    *Undue Influence.    Attorney at Law.*

No error appeared in the denial of a motion for the framing of a jury issue, whether an alleged will of an elderly woman was procured to be made through undue influence of her daughter, who had lived with her and was the principal beneficiary, and of her daughter's husband, who acted as her attorney during the last few years of her life and, within a month of her death, drew the alleged will and superintended its execution, but did so only at her urgent request after he had suggested that it be drawn by another attorney.

PETITION, filed in the Probate Court for the county of Essex on January 29, 1937, for probate of the will of Julia Feeney, late of Lynn.

A motion, as amended, for the framing for a jury of an issue, whether the alleged will was procured by fraud and undue influence of Lillian J. Frawley and Arthur J. Frawley, or either of them, was heard and denied by *O'Brien,* J. Lillian M. Snell appealed.

*R. P. Baldwin,* for the respondent Snell.

*R. L. Sisk,* for the petitioner.

Cox, J. This is an appeal from an order of a judge of probate denying a motion for the framing of an issue for a trial by jury concerning an instrument, dated December 31, 1936, offered for probate as the last will and testament of Julia Feeney of Lynn. The proposed issue relates to undue influence on the part of the decedent's daughter, Lillian J. Frawley, and Arthur J. Frawley, her husband. The case was heard on statements, which are reported, made by counsel of the respective parties as to the evidence which they expected to offer if there should be a jury trial.

The rule governing the framing of issues has been restated recently and needs no repetition. *Woodwell* v. *Sloman, ante,* 17.

The decedent died on January 21, 1937, at the age of seventy-three. The instrument offered for probate is dated December 31, 1936, and the value of the decedent's property is estimated at from $40,000 to $60,000. The decedent, who had been a widow for about thirty years, left a son, a daughter, and a granddaughter. The son had been away from home for a long time, and, without going into the narrated details of his life and relations with his mother, it well could have been found that he did not have many claims to his mother's bounty. The daughter, Lillian J. Frawley, who is the residuary legatee named in the instrument, has always lived with her mother. In 1926 she married Arthur J. Frawley, an attorney. They have two children, and with the decedent have constituted one family since the marriage, Frawley paying the household bills except those for heat and telephone. The other daughter, Helen, the mother of the granddaughter, had some difficulties with her husband in 1919. They separated, and she and her daughter, Lillian Snell, who is the contestant, came to live with the decedent. Helen died in 1920 and the granddaughter was then taken from the decedent by her father. In 1922 the decedent made a will, by the terms of which she gave $1 each to her son and granddaughter, and all the rest and residue of her estate to her daughter Lillian. In 1930 the decedent was about to undergo a very serious surgical operation, and while upon the operating table in the hospital she destroyed

the 1922 will. The decedent was a woman of business acumen, and whatever property she left was acquired by her own industry and effort.

The record contains conflicting statements as to the attitude of the decedent toward the granddaughter. There is very little, if anything, even by way of suggestion, that the relationship between the decedent and her daughter Lillian was anything but most happy and harmonious. The instrument offered for probate was drawn by Arthur J. Frawley, the decedent's son-in-law, and aside from the statements alleged to have been made by the decedent as to her intentions with respect to her relations and what provision she was to make for them by will, the principal contention of the contestant is that the relationship between the decedent and Frawley was of such a character that an issue should be framed on the undue influence of his wife and himself.

After the decedent came out of the hospital in August of 1930, she having destroyed the 1922 will in May, it is said that she expressed some anxiety over the attitude of Frawley and referred to his conduct toward her to which she objected, giving some instances; that he was very acute about money matters, and in general "she sized him up as being decent in his treatment of his wife but otherwise, in his treatment of her, she didn't like him"; that if he knew about her disposition, or proposed disposition, of her property, she was anxious as to the effect it might have on his attitude toward his wife and toward her; and that she did not want him under any circumstances to share in her money, and wanted to provide in her will so that he would have no control over what she gave Mrs. Frawley and so that he could not persuade the latter to give him any control over it. At the same time she discussed her son and expressed a desire to make some provision for him so that he would have something in his old age. She also spoke about Lillian Snell, her granddaughter, saying that she was a good little girl and ought to have her share. On August 18, 1930, the decedent executed an instrument as her will at the office of Mr. Sullivan, an attorney in Lynn, who had been

her friend for a great many years and who also had drafted the 1922 will. By the terms of this will of 1930 some individual bequests were made, her clothing and personal effects and household furniture were given to Mrs. Frawley, and the house where they lived was left in trust for the benefit of Mrs. Frawley during her life with a provision that if she became a widow the real estate should belong to her in fee. There were other provisions relative to the payment of the expenses and charges on the real estate. The will further provided that, if Mrs. Frawley died while the trust was in existence leaving issue surviving her, the trustees should hold the home or any proceeds of its sale until the youngest of her children became twenty-one years of age, at which time the trust should end, and if all the children died before the youngest of them became twenty-one years of age, then at the death of the last surviving child, or, if none of her children were living at her death, the property was to be held under the trust created for the son and granddaughter. The residue of the estate was given in trust for the benefit of Mrs. Frawley, the son and the granddaughter. The share of Mrs. Frawley, which was one third of the residue, was to be held in the same manner as was provided for with respect to the home. The one third which was held for the benefit of the granddaughter was to become payable to her at the age of thirty, and the one third for the benefit of the son was to become payable to him at the age of fifty. The income of the thirds was, until the principal was payable, to be paid to the several beneficiaries.

There were conflicting statements as to the decedent's attitude, not only as to this will of 1930 but also toward her children and grandchild after this will was made. For example, it is said that a year or two before she died, in speaking of the disposition of her property, the decedent said she was leaving the bulk of it to her daughter, son and granddaughter, all to share alike, and that in the spring of 1936 she indicated no change in her disposition and showed the same friendly attitude toward her son and granddaughter. Her interest in her granddaughter increased as the child grew older and continued up to the time of her death. At

one time when the granddaughter was discouraged over her failure to secure a position as teacher, the decedent told her not to worry and that she would look out for her. On the other hand, it was said that in the early spring of 1936 the decedent had stated that she was going to make a new will and that she was going to make some changes. In 1935 her daughter Lillian had a very serious illness and for a long time it was doubtful if she would recover. During this illness the decedent is said to have spoken of the injustice, as she called it, that she had done to her daughter, and that if Lillian got better she was going to correct it.

Frawley, the son-in-law, although he had lived in the household with the decedent from the date of his marriage in 1926, did not do any of her legal work until about 1932. There was an offer to show that he acted for her from then on in several instances, some of which were important, and the proponent concedes that the decedent relied upon Frawley as her attorney in attending to her affairs. The circumstances leading up to the drawing of the instrument by Frawley in December of 1936 are described almost entirely by counsel for its proponent. The decedent was then ill with a cancer, and she spoke to her daughter about making a new will and asked if her son-in-law would make it, whereupon her daughter replied that he would not and that she had better let Mr. Sullivan make it. The decedent replied that she did not want Mr. Sullivan. There was further talk about the making of the will and Frawley stated that he did not wish to draw it and that the decedent had better get Mr. Sullivan. Finally the decedent insisted that she wanted Frawley to draw it and he consented. She gave him some data concerning the disposition of her property. After he had drawn the instrument, and on the morning of the day of its execution, he took a copy of it to the decedent, and read it over with her. She said, in substance, that it was what she wanted. There was some discussion between the decedent and Mrs. Frawley over the possibility of the son making trouble, whereupon the decedent is alleged to have said, "Well, I'm going to give them enough so they won't make trouble for you, and if they do make trouble

they will lose what I give them." The instrument was left with the decedent. On the evening of that day, she read it again and said it was just what she wanted. After supper the instrument was executed in Frawley's presence. It was witnessed by a police officer of the city of Lynn, said to be friendly with Frawley but nearly as well acquainted with the decedent, by a Miss Cleary, who was a friend of Mrs. Frawley, and by a Mr. Fox, an attorney, who was associated to some extent with Frawley. The instrument provides for several small bequests; in addition, $2,000 is given to Mrs. Frawley in trust for the son, the same to be paid in semi-annual instalments of $100, with a provision that if any balance remains after the death of the son it shall go to Mrs. Frawley; $1,000 is given to Mrs. Frawley in trust for the granddaughter, with similar provisions for semiannual payments of $100, and payment of any balance to Mrs. Frawley; the residue is given to Mrs. Frawley, and there is a further provision that any person named as beneficiary, who directly or indirectly resists the probate or contests the validity of the will, shall by such opposition or contest be barred and divested of the benefits provided for him or her, and his or her share shall be paid to Mrs. Frawley.

. The decision of the probate judge adverse to the motion is entitled to weight even though the record discloses everything which was before him. An element of discretion is vested in him which will be given weight on appeal. *Hannon* v. *Gorman*, 296 Mass. 437. We are asked to reverse the judge's order under the authority of cases such as *Hayes* v. *Moulton*, 194 Mass. 157, *Raposa* v. *Oliveira*, 247 Mass. 188, *Tarr* v. *Vivian*, 272 Mass. 150, *Bessom* v. *Bayrd*, 282 Mass. 58, and *Israel* v. *Sommer*, 292 Mass. 113. But we cannot say that in the circumstances of this case the judge was wrong in denying the motion. The instrument on its face has many of the aspects of a natural disposition of the decedent's property. Mrs. Frawley, the principal beneficiary, had always stayed at home with her mother. It was represented that during her youth she had worked about the home, attended the store which her mother conducted, delivering the orders when she was hardly able to carry

them, cared for her sister during her last illness when she was living in the home, and remained with her mother up to the time of her death. This is not disputed. She had two children of whom it was said the decedent was very fond. Frawley had lived in the household from the time of his marriage. He had acted for the decedent as her attorney for a number of years. It was not disputed that the decedent was of an independent type. The problem which was presented to Frawley when the decedent insisted that he should make her will was one not free from difficulty to him, and while it might have been better if he had persisted in his refusal, yet upon a consideration of all the circumstances we think that this case is distinguishable from others where a will has been drawn by one bearing a relation of trust and confidence to the decedent and an issue of undue influence has been framed. In reaching this conclusion we are not unmindful of the statement in *Wellman* v. *Carter*, 286 Mass. 237, 248, "Although there is no presumption of undue influence on an attorney's part, yet in view of the jealous scrutiny to which the law has thought it wise to subject transactions of this kind it is proper that ordinarily an investigation by a jury be had." In the opinion of the majority of the court, the entry should be

*Order denying motion for issue affirmed.*