MADELEINE L. REILLY *vs.* JAMES A. MCAULIFFE & others.

Plymouth.    November 6, 1953. — February 26, 1954.

Present: QUA, C.J., WILKINS, SPALDING, WILLIAMS, & COUNIHAN, JJ.

*Will,* Validity. *Undue Influence. Attorney at Law. Unsound Mind.*

A conclusion by a judge of probate that a purported codicil executed by a
testatrix nearly three years after the execution of her will and ten days
before her death was procured by undue influence of the petitioner
for proof of the will and codicil was not plainly wrong on reported
evidence showing that a fiduciary relationship existed between the
testatrix and the petitioner, who was not her relative but was her
attorney and conservator, that by the codicil the residue, comprising
the bulk of the estate, was given solely to the petitioner instead of to
near kindred of the testatrix named as residuary legatees in the will
and on friendly terms with her, that the petitioner had ample oppor-
tunity to influence the testatrix during daily visits to her for some
weeks before the execution of the codicil, that the petitioner was
virtually in charge of its execution although it was ostensibly attended
to by another attorney, that the testatrix did not have the benefit of
independent advice, and that she was enfeebled by both advanced age
and disease at the time of the execution of the codicil.   [147–149]
A finding by a judge of probate, not plainly wrong on reported evidence,
that at the time a purported codicil was executed by a testatrix she
"was not capable of understanding the nature and extent of her prop-
erty or the natural objects of her bounty" established lack of testa-
mentary capacity on her part to make the codicil.   [149–150]

PETITION, filed in the Probate Court for the county of
Plymouth on June 11, 1951, for proof of a will and codicil.

The case was heard by *Davis, J.*

*Edward O. Proctor,* for the petitioner.

*Edward H. Stevens, (Eben G. Townes* with him,) for the
respondents.

SPALDING, J. This case comes here on the petitioner's appeal from a decree disallowing an instrument purporting to be a codicil to the will of Mary A. Donovan, late of Brockton. The judge made findings of material facts and the evidence is reported.

The facts are in substance these. On August 4, 1948, Mary A. Donovan, hereinafter called the testatrix, executed her will. There was no contest with respect to this instrument and it was admitted to probate. After making pecuniary bequests amounting to $3,650 and bequests of certain personal effects, the testatrix under the twelfth clause of her will gave the residue of her estate to James, Marion, and Charles Pyne, children of her niece by the half blood, Elizabeth Pyne; to Mary Creeden, John and James McAuliffe, children of her sister Hannah McAuliffe; and to Margaret, Mary Ellen and George Twomey, children of her sister Ellen Twomey, share and share alike. Madeleine L. Reilly, hereinafter called the petitioner, was named executrix.

An instrument purporting to be a codicil to this will was executed by the testatrix on May 26, 1951, ten days before her death. By its terms clauses 6, 7, and 12 of the will were revoked and new provisions were substituted. A legacy of $200 to her nephew George Twomey under the sixth clause was increased to $1,000, and a legacy of $25 to Annie Reilly (the petitioner's mother) under the seventh clause was increased to $50. Under the substituted twelfth (residuary) clause the petitioner was made the sole legatee. If the codicil is allowed the petitioner would receive the major portion of the estate, the value of which is approximately $20,000.

The testatrix, a maiden lady, was eighty-one years of age when she died. For many years she had been employed as a domestic servant in various households. When not employed she lived in the home of her sister Ellen Twomey in Brockton and for a while she stayed with her sister Hannah McAuliffe who also lived in Brockton. In 1946 she rented a room in the home of the petitioner's mother, Mrs. Annie

Reilly, of Brockton, and lived there until April 3, 1951. Throughout this period "the relation of . . . [the testatrix] to her sisters and brother and their families was always pleasant."

On April 3, 1951, the testatrix was admitted to the Brockton Hospital. Her condition was diagnosed as cancer of the bladder. As a result of an operation performed on her on April 9 it was discovered that the cancer was inoperable. On April 25 she was removed to the Braemoor Rest Home. While at the hospital she was constantly under the influence of opiates and drugs administered for the purpose of deadening pain. During the period that she was at the rest home she "was suffering severely from cancer" and was given opiates, sedatives, and drugs to alleviate pain.[1] At times both at the hospital and at the rest home she "was confused and had some hallucinations but was generally rational."

On April 26, 1951, the day following the removal of the testatrix to the rest home, the petitioner and Mr. Ovide V. Fortier were appointed conservators of her estate on the grounds of advanced age and physical incapacity.

The petitioner has been a member of the bar since 1927. She first became acquainted with the testatrix in 1946 when the latter went to live in the home of the petitioner's mother. At times when the petitioner would take her mother for an automobile ride the testatrix would be invited to accompany them. The petitioner attended to the legal affairs of the testatrix. During the summer of 1948 the testatrix lived with the petitioner at a farm which the latter owned in Pembroke. It was during this period that the will, drawn by the petitioner, was executed by the testatrix. In 1949 the testatrix discussed proposed changes in her will with the petitioner but nothing further was done about it.

While the testatrix was at the rest home the petitioner visited her every day. During one of these visits the testatrix asked the petitioner to bring to her the 1948 will, which

---

[1] The petitioner contends that there is no evidence that the testatrix was given opiates at the rest home, but the evidence reveals that she was given pantopon which medical dictionaries define as a trade name of an opium preparation.

then was in the petitioner's possession. . The petitioner complied with this request and they discussed the will and the changes which the testatrix had in mind. The petitioner made notes of the proposed changes. Since by these changes the petitioner was to be the residuary legatee, she suggested that it be drawn by another attorney. She asked Mr. Fortier, an attorney, if he would prepare a codicil but he declined on the ground that inasmuch as he was one of the conservators of the testatrix he could not properly do so. She then asked Mr. Mantalos, a Brockton attorney, to draft the codicil, and it was prepared by him in Mr. Fortier's office on the basis of information furnished by the petitioner.

After the codicil was prepared, Mr. Mantalos and the petitioner went to the rest home to have it executed. Mr. Mantalos, who had never seen the testatrix before, was introduced to her by the petitioner who then left the room. Mr. Mantalos made no inquiries as to who the testatrix's physician was, nor did he read the will of 1948 to her. In fact he did not have it with him. At the time of the execution of the codicil the testatrix was "very weak" and her condition was "very critical." On the evening prior to its execution the testatrix was given a strong dosage of demerol, a drug for the relief of pain.[1]

The judge concluded that "the alleged codicil was procured by the undue influence of Madeleine L. Reilly exercised upon Mary A. Donovan, and that at the time of . . . [its] execution . . . Miss Donovan was not capable of understanding the nature and extent of her property or the natural objects of her bounty."

The various factors to be considered in cases of fraud and undue influence have been fully set forth in *Neill* v. *Brackett*, 234 Mass. 367, 369–370. It was there said, among other things, that "When the donor is enfeebled by age or disease, although not reaching to unsoundness of mind, and the relation between the parties is fiduciary or intimate,

---

[1] The judge stated in his findings that the testatrix was also given demerol at 10 A.M. on May 26, an hour before the alleged codicil was executed, but this finding is not warranted by the evidence. At that time she was given 10 grains of aspirin and a digitalis tablet.

the transaction ordinarily is subject to careful scrutiny" (page 369). Here it is plain that the testatrix was enfeebled by both age and disease. And the relationship between the petitioner and the testatrix was of a fiduciary nature. The petitioner was not only the testatrix's attorney but was also her conservator. Where an attorney at law who is not himself a relative of the deceased draws a will for a client of advanced years who leaves near kindred, and where the attorney himself attends to the execution of the will and the client has no independent advice, and where the kindred receive little or nothing under the will and the attorney benefits substantially by it, although there is no presumption of undue influence on an attorney's part, the law views the transaction with considerable jealousy, and slight additional circumstances indicating susceptibility to influence on the part of the testator, or domination on the part of the attorney, will support a finding of undue influence. *Tarr* v. *Vivian*, 272 Mass. 150, 153. *Wellman* v. *Carter*, 286 Mass. 237, 248. *Mooney* v. *McKenzie*, 324 Mass. 685, 687–688. The heavy duty resting on an attorney in all personal dealings with his client has been fully stated in *Israel* v. *Sommer*, 292 Mass. 113, and *Barnum* v. *Fay*, 320 Mass. 177, 181, and need not be restated.

Applying these principles to the case at hand, we are of opinion that the judge was not plainly wrong in concluding that the codicil was procured by undue influence of the petitioner. The relationship was one of trust and confidence. The petitioner, who was not related to the testatrix, would under the codicil receive the major portion of her estate. Near kindred with whom the testatrix was on friendly terms and who had been given virtually the entire estate under the will made approximately three years before were given nothing in some cases and relatively small amounts in others. The petitioner, by reason of her daily visits to the rest home, had the opportunity to influence the testatrix. It is true that the execution of the codicil did not actually occur in the presence of the petitioner but in the circumstances that is not particularly significant. The

judge could have found that to all intents and purposes
she was in charge of the execution. All the information
necessary for drafting the codicil was obtained from the
testatrix by the petitioner and Mr. Mantalos prepared the
codicil from this information. He had never seen the testa-
trix prior to the execution of the codicil and did not read
the will to her. The judge evidently concluded that the
testatrix did not have the benefit of independent advice and
we cannot say that this conclusion was wrong. He might
well have concluded that the petitioner called in Mr. Man-
talos not for the purpose of providing the testatrix with
independent advice but rather to perform a perfunctory
ceremony in order to endow the transaction with the ap-
pearance of propriety. "Independent legal advice which
is incompetent, or perfunctory, or given without adequate
knowledge of the situation, will not suffice." *Israel* v.
*Sommer*, 292 Mass. 113, 123. The facts just mentioned
coupled with the advanced age of the testatrix, her weak
condition and the fact that she at times was confused and
had hallucinations place the case within the authority of
*Tarr* v. *Vivian*, 272 Mass. 150, *Wellman* v. *Carter*, 286 Mass.
237, and *Mooney* v. *McKenzie*, 324 Mass. 685, rather than
*Frawley* v. *Snell*, 299 Mass. 398, and *Slater* v. *Munroe*, 316
Mass. 129, relied on by the petitioner.

We have not overlooked the finding that "there were
demonstrations of affection as between . . . [the peti-
tioner] and . . . [the testatrix]" but it does not require
a conclusion different from that reached by the judge. Nor
do we think that the error in the judge's finding that the
testatrix had taken demerol on the morning of May 26, to
which we have alluded in the footnote on page 147, is suffi-
cient grounds for disturbing his ultimate conclusions. It
is apparent that they rested on broader grounds.

The judge further found, as stated above, that at the
time the alleged codicil was executed the testatrix "was not
capable of understanding the nature and extent of her
property or the natural objects of her bounty." We think
that this finding, which was not plainly wrong, established

lack of testamentary capacity on the part of the testatrix. *Goddard* v. *Dupree*, 322 Mass. 247, 250. *Santry* v. *France*, 327 Mass. 174, 175–176.

*Decree affirmed.*