PLATO A. SPILIOS & others vs. HELEN BOURAS.

Middlesex.    December 5, 1957. — March 7, 1958.        •

Present: WILKINS, C.J., RONAN, SPALDING, WHITTEMORE, & CUTTER, JJ.

*Probate Court*, Jury issues.    *Will*, Validity, Execution.    *Unsound Mind.*
   *Undue Influence.*

Statements of expected evidence by counsel and affidavits by attesting
   witnesses to a will, one of whom would testify that he read the attesta-
   tion clause before he signed and with another witness would testify
   that the testator said it was his will and signed it in the presence of all
   three witnesses and that then the witnesses signed in his presence and
   in the presence of each other, did not warrant framing a jury issue as
   to due execution of the will.  [178]
Expected evidence stated by counsel in a contested will case showed no
   error in the denial of a motion for a jury issue as to whether the al-
   leged will and codicil of the controlling stockholder of five companies
   engaged in the laundry business were procured to be made through
   undue influence of one of his two sons, a principal beneficiary, and of
   a daughter, both of whom for years had been engaged in their father's
   business and held a substantial amount of stock in those companies,
   and of that daughter's husband, the decedent's attorney for many
   years and the drafter of the will and codicil, which named her executrix
   and a principal beneficiary, whereas four other daughters of the de-
   cedent received only comparatively minor bequests.  [180]
There was no error in the denial of a motion for a jury issue as to whether
   a testator in poor health lacked testamentary capacity at the time he
   executed a codicil to his will in view of statements of expected evidence
   of his activities and condition preceding, at the time of, and after exe-
   cution of the codicil, which did not fundamentally change the general
   scheme set forth in the will, notwithstanding expected testimony from
   two physicians attending him that he was suffering much pain at the
   date the codicil was made and that they gave him drugs "to keep him
   just at the threshold of consciousness."  [181]

PETITION, filed in the Probate Court for the county of
Middlesex on June 8, 1956, for proof of the will and codicil of
Athans E. Spilios, late of Belmont.

A motion for jury issues by the contestant Helen Bouras,
a daughter of Spilios, as to due execution of the will and
codicil, soundness of mind, and undue influence exercised

by Plato A. Spilios, Edith S. Varkas, and Alexander D. Varkas was heard by *McMenimen,* J.

*Carl H. Amon, Jr.,* for the contestant.

*Henry M. Leen,* (*Robert J. Sherer* with him,) for the proponents.

RONAN, J. This is an appeal from an order of the Probate Court for Middlesex County denying a motion to frame jury issues with respect to certain instruments offered for probate as the will and codicil of Athans E. Spilios, late of Belmont. The motion was directed to due execution, testamentary capacity and undue influence. The motion was heard upon the statements of counsel and we have everything before us that the judge of probate had. It is our duty to examine these statements and to decide for ourselves whether a genuine question of fact is presented, based upon evidence of a substantial nature giving adequate ground for a reasonable expectation of a result favorable to the party asking for the issues after affording to the decision of the judge of probate the weight to which it seems entitled. *Fuller* v. *Sylvia,* 240 Mass. 49, 53. *Cook* v. *Mosher,* 243 Mass. 149, 152–153. *Clark* v. *McNeil,* 246 Mass. 250, 256. *Cranston* v. *Hallock,* 281 Mass. 182, 184. *Hannon* v. *Gorman,* 296 Mass. 437, 438. *Boston Safe Deposit & Trust Co.* v. *Blaisdell,* 333 Mass. 51, 56.

Athans E. Spilios, a native of Greece, came at the beginning of the century, with his wife and son Angelos to America, where he finally embarked in the laundry and linen supply business. He controlled fifty per cent of the stock in five companies engaged in such business. This stock ownership comprised the most valuable part of the substantial assets of his estate. The remaining stock in these companies was divided equally among his two sons Angelos and Plato, and his daughter Edith Varkas, all of whom for years had been engaged in the father's business.

The will devised the dwelling house in Allston to the widow and gave $100 a week for life to be paid by the trustees Angelos, Plato and Edith. Upon the death of the

widow the trust is to be distributable one third to Plato and one third to Edith, and one third is to continue during the life of Angelos and upon his death this share is to be distributed equally to the children of Plato and Edith. Each of the four daughters other than Edith is to receive $2,000 a year for ten years. The codicil substitutes the new Belmont property for the old Allston property and reduces the gifts to his four daughters to $2,000 a year for five years. On October 18, 1954, the decedent summoned three employees to the driver's room in one of the laundries and told them that he had a paper for them to sign, pointing to some papers which lay upon a desk at which he was seated. One Pilioglos, a witness to the will, furnished counsel for the contestant with an affidavit to the effect that the decedent had not signed the will up to the time that he, Pilioglos, became a witness. As against this claim of Pilioglos, counsel for the proponents of the will points out that Pilioglos joined Angelos in leaving the old business and entered the employ of Angelos in a competing business. On July 26, 1956, Pilioglos together with one Smith and one Karthas, the remaining witnesses, made out separate affidavits showing full compliance with the statute by Spilios in executing the will. Furthermore, counsel for the proponents expected to show by Smith that the latter read the attestation clause before he signed, and stated that both he and Karthas would testify that Spilios said it was his will and he signed in the presence of all three witnesses, and that then the witnesses signed in his presence and in the presence of each other.

The only possible question that could arise as to the will was its execution and the present record does not warrant the framing of an issue. The validity of the codicil amounts to a republication of the will.

We now turn to the codicil which was made on March 2, 1956. Spilios was resting in his home in Florida. On that morning he telephoned a Mrs. Sutton who was living in a hotel fifteen miles away. He had known her for thirty years and she had visited his home. He asked her if she would sign a paper for him. She agreed and with her parents drove

to the Spilios residence. She was invited into the dining room with the other witnesses. Spilios produced an instrument which he said was a codicil and explained in Greek, in answer to a question by Mrs. Sutton, that it was a will. He initialed the pages and signed the second page. He passed the pen to a witness and the same pen was used by all of them in executing the codicil. Mrs. Sutton's father, who was standing near the dining room door and who had been an intimate friend of Spilios almost since the latter migrated to America if not before in Greece, began to break down and show a bit of emotion, and Spilios noticing his old friend's condition remarked that all must die at some time and that "it is good to have a house in order." After the execution of the codicil Mrs. Sutton and her parents continued to stay for about an hour, discussing various subjects with Spilios. Two weeks later she paid a friendly visit and had dinner with Spilios. The witnesses who had been interviewed corroborated Mrs. Sutton. Condos, another witness, was connected in church work with Spilios. He last saw Spilios after he returned from Florida and Spilios was as alert and responsive as he had been during the last twenty-five years. The contestant contended that Mrs. Sutton was not at the home of Spilios at any time while any of the other witnesses to the codicil were present and that she did not know the nature of the instrument she witnessed. But the contestant's principal attack on the codicil is that the decedent lacked testamentary capacity. An eminent surgeon from Boston who had operated upon Spilios twice and had seen him frequently happened to be in Florida and visited him about a month before the codicil was executed. Three days after the codicil was made the doctor wrote Spilios thanking him for the check and "for the very pleasant visit we had in Florida." According to this physician, who saw the decedent from December of 1954 through the early part of 1956, he was of sound mind and knew what he was doing.

Dr. Helen Harmand was the wife of the decedent's son Angelos. After her marriage she retained her professional

name.   She had given up her regular practice but continued to see some of her patients.   She went to Florida to assist Dr. John Speropoulos in caring for her father-in-law.   Both of these physicians would testify that Spilios was suffering much pain at the date the codicil was made and that they resorted to drugs "to keep him just at the threshold of consciousness."   Six days after the codicil was executed a large abdominal mass was removed and Spilios had considerable relief.

Mr. Varkas was a member of the bar for over thirty years. He was the husband of Edith, one of the decedent's daughters.   He had performed the decedent's legal work for twenty-five years and when the decedent requested him to attend to the execution of a will and subsequently a codicil he demurred and recommended one of the judges of the Municipal Court of the City of Boston, but Spilios was not satisfied and as a result Mr. Varkas drafted both the will and codicil.   He gave the will to Spilios and mailed the codicil to him with instructions as to its execution.   Although it would have been better if some other attorney had attended to the drafting and execution of both the will and the codicil — and such a situation requires close scrutiny and examination to be sure there is no over-reaching of a client by the attorney — we are satisfied that making Edith an executrix and one of the remaindermen was in recognition of her services for over thirty years in the employ of her father.   She was the only one of his daughters who remained working for him after marriage.   It is to be further noted that during his life he shared the remaining stock equally with her and her two brothers.   At the end of the trust the share of Angelos who had no children was to go to the children of Plato and Edith.   Spilios wanted the business to remain in the family perhaps as a memorial to him.   We think that this aspect of the case resembles *Wellman* v. *Carter*, 286 Mass. 237, *Frawley* v. *Snell*, 299 Mass. 398, *Slater* v. *Munroe*, 316 Mass. 129, and *Wood* v. *McDonald*, 332 Mass. 220, rather than *Tarr* v. *Vivian*, 272 Mass. 150, *O'Brien* v. *Collins*, 315 Mass. 429, and *Reilly* v. *McAuliffe*, 331 Mass. 144.

The main issue in the entire case is that of testamentary capacity at the time the codicil was executed. There is a direct conflict between the two physicians and the witnesses to the codicil. Perhaps the judge as he had a right to do discounted the evidence of the physicians. It is hard to believe that one drugged to the degree that they claimed the decedent was, would think about executing any paper, much less that he would remember that a young friend of his family was available to be a witness and request her to witness his codicil and to telephone to her, or that he would initial the pages of the codicil and sign the last page and then have the four witnesses use the same pen in signing as witnesses. Mrs. Sutton and her parents visited the decedent on a farewell trip before they returned to Boston about two weeks after the codicil was executed and had dinner with him. It is strange that such a trip would ever have been contemplated if Spilios was as ill as represented by the two physicians. If he got a period of respite by the operation subsequent to the making of the codicil he never asked to have the codicil changed. In fact the codicil did not fundamentally change the general scheme set forth in the will. Another witness to the codicil saw Spilios after he returned to Boston and his mental condition then appeared to be the same as when he executed the codicil. We think the case resembles *Harvey* v. *Knapp*, 270 Mass. 354, and is governed by it. See also *Ware* v. *Morton*, 288 Mass. 107; *Walsh* v. *McGrenery*, 299 Mass. 153; *Slater* v. *Munroe*, 316 Mass. 129.

*Order denying jury issues*
*affirmed.*