BARTHOLOMEW J. RONAN, executor, *vs.* JOHN JOSEPH MORONEY & another.

Essex.    March 2, 1943. — March 31, 1943.

Present: FIELD, C.J., LUMMUS, QUA, & COX, JJ.

*Will,* Validity.   *Unsound Mind.*

Conflicting testimony did not show to be plainly wrong a finding that a certain alleged testator suffering from arteriosclerosis of the brain possessed mental capacity to make a will.

PETITION, filed in the Probate Court for the county of Essex for proof of the will of Timothy J. Moroney, late of Peabody.

The case was heard by *Phelan,* J.

*L. B. Morley,* (*J. B. Harrington* with him,) for the respondent John Joseph Moroney.

*R. L. Sisk,* for the petitioner.

LUMMUS, J.   This is an appeal from a decree of the Probate Court of Essex County allowing the will of Timothy J. Moroney, late of Peabody, who died on May 7, 1942, leaving a daughter, Nora B. Moroney, and a son, John Joseph Moroney, the contestant.   The evidence is reported, and may be summarized as follows:

The decedent was a man sixty-five years old.   He had been married twice, and both wives were dead.   The children were apparently by the first wife.   In April, 1942, **his**

lawyer, Bartholomew J. Ronan, Esquire, received a telephone message from a woman, apparently the daughter, asking him to come to the decedent's house. A few days later he went there. The decedent was in bed, and no one else was in the room. He told Mr. Ronan that he wished to fix up his affairs. He said he wished a little girl, Alice L. Moulton, also known as Alice L. Moroney, to have $200. He said he would give nothing to his son, because he had already done enough for the son. He said he wished his daughter Nora to have everything else.

Mr. Ronan prepared a typewritten will accordingly, and returned to the decedent with it two or three days later. This was on April 24, 1942. The decedent read it, and then said that he wished to give $50 to each of four priests of his parish. Mr. Ronan copied the will in handwriting, inserting the gifts to the priests. The decedent read the new draft, and expressed his approval of it. Mr. Ronan then sent for two witnesses. One of them was Dr. Bradley, and the other was a neighbor named Lally. After they arrived, the decedent signed the will in bed, and then Mr. Ronan and the other two witnesses signed it in his presence and in the presence of each other, at the request of the decedent. After the decedent signed, he said, "Beat that if you can." Mr. Ronan took this as expressive of the excellence of the signature. No one was present in the room except the decedent and the three witnesses.

Dr. Bradley was not an alienist, but was the physician attending the decedent, treating him for gangrenous ulcers of the legs, and arteriosclerosis of the brain and heart. The decedent had been confined to his bed only about three weeks before he died. Dr. Bradley testified that when the decedent signed the will his mental condition appeared "all right." The witness Lally testified that at the time of signing the will the decedent was "absolutely of sound mind." He testified also that for some days before the execution of the will he saw the decedent every day, at different times, and always found him mentally clear, and able to talk interestingly about the topics of the day. Mr. Ronan testified that the decedent was of sound mind, and

that his mental condition was the same on each of the two visits.

For the contestant, the statement of a barber was admitted. He said that about April 22, 1942, he went to shave the decedent, but could not do so for he "was out like a light." He returned the next morning and shaved the decedent, but the latter "talked foolish like." A neurologist and psychiatrist, who had never seen the decedent, testified that arteriosclerosis of the brain in an advanced stage results in poor judgment, a lessening of will power, and a susceptibility to suggestion, although there may be lucid intervals. He testified, in answer to a hypothetical question, that the decedent was, at the date of the execution of the will, mentally incompetent to understand the nature of his property or the persons who would be the natural objects of his bounty. But the witness admitted that the decedent's relations with Mr. Ronan as to the will indicated that he "was enjoying a lucid interval," and understood what he was doing, although he was "not as clear mentally as you would expect him to be."

We see no evidence of undue influence, within the rule laid down in *Neill* v. *Brackett*, 234 Mass. 367. As to mental capacity, the rule is stated in the charge of Mr. Justice Charles Allen in *Whitney* v. *Twombly*, 136 Mass. 145, 146, 147, which was upheld by the full court and later approved in *Murphy* v. *Donovan*, 295 Mass. 311, 315. He said, "Soundness of mind, such as will enable a person, under the statute, to make a will, has relation to the business to be transacted, namely, the disposition of her property by will. Her mind must have been sound with reference to whatever is involved in this transaction; that is to say, she must have been able to understand, and carry in her mind, in a general way, the nature and situation of her property, and her relations to those persons who are about her; to those who would naturally have some claim to her remembrance; to those persons in whom, and those things in which, she has been mostly interested. She must have been capable of understanding these things, and the nature of the act she was doing, and the relation in which she stood

to the objects of her bounty, and to those who ought to be in her mind on such an occasion, and free from any delusion which was the effect of disease, and which would or might lead her to dispose of her property otherwise than she would have done if she had known and understood correctly what she was doing."

The decree of the Probate Court is to be affirmed unless it appears to be plainly wrong upon the reported evidence. *Old Colony Trust Co.* v. *Yonge,* 302 Mass. 49, 50. A careful examination of the evidence shows that the decree was not wrong, much less plainly wrong.

*Decree affirmed.*