BOSTON SAFE DEPOSIT & TRUST COMPANY *vs.* NATHANIEL BLAISDELL & others.

Suffolk. May 5, 1955. — July 6, 1955.

Present: QUA, C.J., WILKINS, SPALDING, WILLIAMS, & COUNIHAN, JJ.

*Unsound Mind. Probate Court,* Jury issues.

Upon a contest of the alleged will of a woman seventy-nine years old and afflicted with progressive arteriosclerosis at the time of its execution nearly five years before her death, a statement by counsel for the proponent of evidence expected from the decedent's former business partners, her personal physician for many years, and two of the witnesses to the will and of expected evidence that her able legal advisor who drew the will and was the third witness had stated before his death that he had no doubt as to her soundness of mind, required that an order by the Probate Court allowing a motion for the framing of a jury issue as to her soundness of mind be reversed, notwithstanding a statement by counsel for the contestants of expected evidence that the arteriosclerosis affected the decedent's brain after the will was executed and that she had been in frail health, eccentric, penurious and mentally confused shortly before its execution, and of expected opinion testimony by a psychiatrist that she was not competent to make the will at the time of its execution.

PETITION, filed in the Probate Court for the county of Suffolk on June 16, 1954, for proof of the will of Harriet Blaisdell, late of Boston.

A motion for a jury issue was heard by *Wilson,* J.

*Harris A. Reynolds, (Thomas H. Dowd, Jr.,* with him,) for the proponent.

*John Kimball, Jr.,* for the contestants.

WILLIAMS, J. This is an appeal by the proponent for probate of the will of Harriet Blaisdell from an order of the Probate Court allowing a motion for the framing of the following issue for a jury, "Was the said Harriet Blaisdell at the time of the execution of the said alleged will of sound mind?" The motion was heard on statements by counsel of evidence which they expected to produce.

The decedent died on May 29, 1954, leaving an instrument purporting to be her will which was executed on July 8, 1949. Therein a piece of jewelry was bequeathed to her niece Olive B. Freeman, and her bedroom furniture to her housekeeper, Ella J. MacSweeney. Her real estate in Nantucket was devised to one Charles A. Blanchard "in grateful recognition of . . . [his] most helpful cooperation in making a success of our long association in the business of the Sunshine Laundry." The residue of her estate was left to the proponent in trust upon the terms and conditions stated in an indenture executed on July 7, 1949. Her attorney, William Harold Hitchcock, was appointed executor.

The petition for the probate of this instrument named as heirs at law and next of kin: Nathaniel Blaisdell of San Francisco, California — brother; Sidney B. Blaisdell of East Greenwich, Rhode Island — nephew; Helen Drew of Tyron, North Carolina — niece; Olive B. Freeman of Providence, Rhode Island — niece; and George B. Whitmarsh of Walpole, New Hampshire — nephew.

Nathaniel Blaisdell, Sidney B. Blaisdell, and Olive B. Freeman are contesting the will.

Counsel for the contestants stated that Miss Blaisdell had been in business and sold out her interest in 1941. From then on her health began to decline. On July 8, 1949, she was seventy-nine years old. She was hospitalized in 1946 and since then had been in frail health. In the fall of 1949 Dr. Parkins, her family physician, advised hospitalization.

For a long time she had suffered from arteriosclerosis and arteriosclerosis of the brain. At the funeral of her brother Bertram in January, 1949, she showed signs of very frail physical condition, complained of being extremely tired, "and in general was confused and had instances of contradicting herself and was inconsistent in certain statements. From January to July of 1949 "there were many instances of physical and mental confusion . . . her physical condition was extremely bad." She had repeatedly said to the contestants Sidney, Nathaniel, and Olive that she intended to leave her property to them. "They were the natural objects of her bounty," and there was no reason for a change in her attitude. The legatee Blanchard had requested that she should not leave the Nantucket property to him — that he did not want it. She had told her housekeeper (Ella J. MacSweeney) that she intended to remember her in her will. From January 4 to July, 1949, although worth at least $200,000 or $300,000, "she became penurious, ate nothing and developed a serious malnutrition and vitamin deficiency . . . she expressed fear that individuals close to her would try to confine her in an institution." Her relations to her relatives continued friendly and affectionate. From January to July, 1949, she developed a habit, of which specific instances will be shown, of not wanting visitors. On many occasions she showed a loss of memory. A handbag containing some $2,000 which was mislaid was found hanging behind a shower curtain. She went to a hospital in February, 1950. While there she was unable to walk to any extent. Its records will show that she had been suffering from confusion and periods of amnesia and the summer before was unsteady of gait. Upon admission her condition was diagnosed as "chronic cardiac disease, malnutrition, and vitamin deficiency, arteriosclerosis of the brain and generalized arteriosclerosis." She remained in the hospital six weeks and after treatment was not completely oriented. There will be medical testimony that arteriosclerosis develops gradually and that her penuriousness before the execution of her will indicated mental weakness. A "prominent

psychiatrist" will testify that based upon the hospital rec-
ords and the expected testimony here mentioned "in his
opinion the testatrix was not competent to execute a will
on July 7, 1949; he will base his opinion on the progressive
nature of the disease that she had, the periods of amnesia
that the witnesses will testify to, the periods of confusion
and loss of strength and the fear that she possessed before
the execution of the will."

The statement by counsel for the proponent was as fol-
lows. Miss Blaisdell conducted the Sunshine Laundry for
twenty years with two partners to whom she sold her in-
terest in the business in 1941, with payments to be made
from the profits of the business over a period of years. The
partners, Susan L. Whitcomb and Carl Tinglof, will testify
that from 1941 to 1944 she visited the laundry daily and
thereafter about six times a year. She talked over "myriads"
of laundry problems and talked with the employees right up
to the time she went to the hospital. She "was never dis-
oriented as to time and place, nor was she confused and she
had the mental capacity to discuss various business prob-
lems." Her attorney since 1921 had been William Harold
Hitchcock, now deceased. He advised her on various prob-
lems connected with the laundry, drew wills for her, and
made out her income tax returns. He drew the present will
and with Charlotte E. Snyder, his secretary, and Dorothy
L. Johnson, a secretary in a neighboring law office, signed it
as a witness. Before his death Mr. Hitchcock stated that
he had no doubt of Miss Blaisdell's soundness of mind.
Miss Snyder will testify that she observed the decedent on
frequent occasions from 1944 to 1952 when she visited Mr.
Hitchcock's office. She was an alert, coherent, intelligent,
kindly woman. At the time of the execution of the will,
Miss Snyder specifically recalls that there was lucid conver-
sation. Miss Blaisdell sat opposite Mr. Hitchcock and read
the will. Miss Johnson was then secured, and Miss Blaisdell
and the three witnesses signed in the presence of each other.
Miss Snyder will answer in the negative a question "whether
or not there was anything at any time, including the day of

the execution of the will, anything in the testatrix's mannerisms, conduct, speech or anything else, including physical appearance, to indicate she wasn't of sound mind or disoriented in any way with respect to persons, business, time or place." While Miss Johnson has no specific recollection of the execution of this will, from 1939 to 1950 she witnessed wills for Mr. Hitchcock two or three times a year and can testify that in no instance did the person executing the will appear to be of unsound mind. The personal physician of the decedent for over thirty years was Dr. Parkins, a graduate of the Harvard Medical School and a member for over twenty years of the senior staffs of the New England Deaconess Hospital and the New England Baptist Hospital. She visited his office on May 7, 1949, for a pain in her shoulder in the region of the heart and on June 27, 1949, for a sprained hand. On both occasions she was normal mentally and discussed a trip to Europe which she was planning. She was in frail physical condition and he advised her to postpone consideration of the trip but to spend the rest of the summer at Nantucket. On October 17, 1949, when she visited him she was perfectly rational and discussed in detail "the various trips and places she wanted to visit this time." As early as 1943 "he formed the impression that her heart trouble and general condition was due to hypertensive cardiovascular disease caused by arteriosclerosis." Her gait had been unsteady "to some degree for a number of years, since about 1940, which is not an unusual thing with elderly men or women." There was no positive evidence that she had arteriosclerosis of the brain until February, 1950. She was somewhat confused when she visited the doctor in February. Although she could carry on a "reasonably responsive conversation" she could not think clearly. She was in the New England Baptist Hospital from February 14 to March 17, 1950. Beginning in 1950 her physical and mental condition deteriorated and continued to deteriorate until the end of her life when she was non compos mentis.

It is settled that to justify the allowance of a motion to frame issues for a jury in a case like the present there must

be a genuine and doubtful question of fact to be determined and evidence of such substantial nature as to afford reasonable expectation of a result favorable to the moving party. *Fuller* v. *Sylvia,* 240 Mass. 49, 53. *Cook* v. *Mosher,* 243 Mass. 149. *Clark* v. *McNeil,* 246 Mass. 250. *Slater* v. *Monroe,* 316 Mass. 129, 131–132. *Wood* v. *McDonald,* 332 Mass. 220, 221. An appeal from the decision of the Probate Court stands precisely as does an appeal in equity with a full report of the evidence. It is the duty of this court to examine the statements of counsel received in lieu of evidence and to decide the case in accordance with its own judgment giving due weight to the decision of the judge. *Cook* v. *Mosher,* 243 Mass. 149, 152–153. See *Hannon* v. *Gorman,* 296 Mass. 437, 438.

There is nothing in the will itself which suggests that Miss Blaisdell did not understand the nature and situation of her property or that in disposing of it she did not have in mind the persons who might reasonably expect to be remembered. See *Whitney* v. *Twombly,* 136 Mass. 145, 146–147; *Murphy* v. *Donovan,* 295 Mass. 311, 315; *Ronan* v. *Moroney,* 313 Mass. 475, 477–478. She left specific legacies to her housekeeper, Ella J. MacSweeney, and her niece Olive, and real estate in Nantucket to a former business associate for a reason which she expressly stated. The major portion of her estate seems to have been settled in trust by an indenture entered into by her with the proponent trust company on the day before the will was executed. Its validity was not questioned in these proceedings. The residue of her estate was left by the will to the trustee named in the indenture to be added to the trust fund. Her attorney, Mr. Hitchcock, was named executor. We are not advised as to the reason why the contestants, as alleged by them, were the "natural objects of her bounty," although according to them she had repeatedly said that she intended to leave her property to them and there was no reason for a change in attitude. Such change in itself cannot be regarded as showing unsoundness of mind.

Miss Blaisdell unquestionably was affected with arterio-

sclerosis which was progressive and eventually affected her brain. There is no direct evidence, however, that the brain condition developed before early in 1950. The evidence of peculiarities in behavior on which the contestants rely is hardly sufficient to warrant an inference that she was not competent to make a will in July, 1949. See *Johnson* v. *Talbot,* 255 Mass. 155; *Union Trust Co.* v. *Magenis,* 259 Mass. 409; *Taylor* v. *Callahan,* 265 Mass. 582; *Mitchell* v. *McLaughlin,* 310 Mass. 41; *Flynn* v. *Prindeville,* 327 Mass. 266. The general statements relating to these eccentricities do not show that she was not fully capable of handling her own affairs. The contestants expect to supplement the evidence relating to her conduct by the testimony of a psychiatrist who will answer a hypothetical question based on the assumed truth of the evidence stated by the contestants and the hospital records of February, 1950, that on July 7, 1949, Miss Blaisdell was not of sound mind. Such testimony will necessarily have the infirmity of being based on only a portion of the evidence. It will fail to take into consideration the evidence of witnesses who had personal knowledge of Miss Blaisdell's mental condition at the time of the will. See *Taylor* v. *Creeley,* 257 Mass. 21, 26–27; *Wellman* v. *Carter,* 286 Mass. 237, 243.

It will appear from expected evidence offered by the proponent that the will was drawn by Mr. Hitchcock who is known to have been an experienced, learned, and careful lawyer and for many years had been the legal advisor of Miss Blaisdell. The will was executed in his office and was witnessed by him, his law secretary, and a secretary from a nearby law office. Before his death he stated that he had no doubt of his client's soundness of mind. The other witnesses saw nothing to show Miss Blaisdell incompetent. Her personal physician will testify to her normal mentality both before and after the will was executed.

In view of this expected evidence, which we have recited in some detail, we think that there was no substantial evidence of incompetency at the time the will was executed. We recognize that weight should be given to the opinion of

the trial judge, but the evidence expected to be offered by the proponent is of such a character that in our opinion the order of the Probate Court should be reversed.

*So ordered.*