ALBERT B. ABBOTT *vs.* HERBERT T. NOEL.

Middlesex.     February 5, 1958. — March 5, 1958.

Present: WILKINS, C.J., SPALDING, WILLIAMS, COUNIHAN, & CUTTER, JJ.

*Probate Court,* Jury issues.  *Unsound Mind.  Undue Influence.*

Upon a contest of the alleged will of an elderly widow who lived alone for many years and saw little of her closest relatives, cousins, and bequeathed the bulk of her property to a friend, expected evidence of many services performed by the friend for the testatrix over a considerable period, of precautions taken in the preparation and execution of the will by an experienced and reputable attorney who, upon learning that the testatrix was under conservatorship, had declined to act until he was assured by her physician that she was competent to make a will, and of the fact that after execution of the will offered for probate she tore in two an earlier will in which the chief beneficiary was the contestant of the proffered will, a man not the natural object of her bounty, together with expected testimony by the physician and the other attesting witnesses that the testatrix was of sound mind, required reversal of an order by the Probate Court allowing a motion for the framing of a jury issue as to the testatrix's testamentary capacity, notwithstanding expected evidence that the testatrix "had failed considerably," was hysterical and forgetful, and did not "know what she was doing." [139]

Expected evidence merely that the conservator of an elderly widow who bequeathed the bulk of her property to the conservator's sister and named him as executor of her will might have had an opportunity to exercise undue influence upon the testatrix and that "he would not allow anyone to be near" her unless he was there did not justify an order of the Probate Court, made upon a contest of such will by the chief beneficiary of an earlier will torn up by her, granting a jury issue as to whether the contested will was procured to be made through the fraud or undue influence of the conservator or of his sister. [139]

PETITION, filed in the Probate Court for the county of Middlesex on October 3, 1955, for proof of the will of Mary A. Benson, late of Reading.

The case was heard by *Leggat,* J.

*George M. Poland,* (*Lyman C. Sprague* with him,) for the proponent.

*Harry M. Lack,* for the contestant, submitted a brief.

SPALDING, J.   Mary A. Benson, late of Reading, died September 29, 1955.   An instrument purporting to be her last will, dated January 1, 1955, was presented for probate by Albert B. Abbott, who was named therein as executor. Herbert T. Noel, who was the principal beneficiary under a purported will of an earlier date, contested the allowance of the later instrument, and, upon his motion, the judge of probate ordered jury issues to be framed on (1) the testamentary capacity of the decedent and (2) whether the execution of the alleged will was "procured to be made by the fraud or undue influence of Emma S. Abbott and Albert B. Abbott or any of them, exercised upon the said Mary A. Benson."   From this order the proponent appealed.

The motion was heard on statements by counsel of expected evidence.   Counsel for the contestant stated that Mary A. Benson died at the age of seventy-eight.   She was a widow and for many years had resided at the Reading Inn.   Sometime in 1953, she became friendly with the contestant who also resided in Reading.   He would take her out for rides, and "do many things that she would ask him to do."   Sometime in 1953, Mrs. Benson asked Mr. Nigro, an attorney practising in Reading, to draw a will for her and he did so.   By this will, which was executed in Mr. Nigro's office sometime in May, she gave all of her property, with the exception of a burial lot, to the contestant.   Mr. Nigro next saw Mrs. Benson sometime in July, 1954, in these circumstances.   Receiving a telephone message from the contestant stating that Mrs. Benson wanted to see him, Mr. Nigro went to the Cotton Nursing Home (where Mrs. Benson was then living) and was informed that she could not be seen for a while.   After waiting an hour and a half

he was about to leave when the proponent entered. The proprietress of the home then told Mr. Nigro that he could see Mrs. Benson, whereupon he and the proponent went into her room. Mr. Nigro realized that she had "failed considerably," as she did not recognize him until told who he was. She then asked him "more or less screaming or hysterical" to take her out of the home. Mr. Nigro was of opinion that, except to locate her closest relative, there was nothing he could do, and left.

In October, after locating a cousin of Mrs. Benson, Mr. Nigro filed a petition for the appointment of a conservator for her, but learned that the proponent had been appointed conservator in July, 1954. In January, 1955, while under conservatorship, Mrs. Benson executed the instrument offered for probate by the proponent in which, except for three small legacies, she left all of her property to Emma Abbott, a sister of the proponent. Up to the time that the proponent "came into the picture" he was no more than a mere acquaintance of Mrs. Benson and from then on "he would not allow anyone [including the contestant] to be near her" unless he was present.

The contestant further proposed to show by persons who took care of Mrs. Benson that she was very forgetful and "wouldn't know anyone's name five minutes after she saw them." She would "get hysterical . . . [and scream], and it was a difficult job trying to take care of her from July, 1954, until she died." Just prior to the execution of the will and shortly thereafter "she didn't know what she was doing," where she was, and "what her family consisted of."

There was other expected evidence stated by the contestant touching alleged irregularities of the proponent in his dealing with Mrs. Benson's property as conservator. But this proposed evidence is very vague and would seem to have little or no relevancy to the issues under consideration. We, therefore, do not recite it.

The statement of counsel for the proponent was as follows: During the many years that Mrs. Benson resided at the Reading Inn Emma Abbott, the principal beneficiary

under the instrument offered for probate, was employed there as a cook. She prepared special dishes for her and often acted as her attendant. Toward the end of her stay at the inn Mrs. Benson required additional care and this was furnished by Miss Abbott. In June, Mrs. Benson, upon advice of her physician, Dr. Baisley, entered the Cotton Nursing Home. Dr. Baisley was of opinion that Mrs. Benson should be relieved of her financial cares, and the proponent, upon his petition, was appointed her conservator. The petition was assented to by Mrs. Benson and Dr. Baisley executed a certificate to the effect that the appointment of a conservator for Mrs. Benson was necessary and that she was of sufficient mentality to understand what she had done in connection with the petition. The proponent had known Mrs. Benson for many years and since 1947 had prepared her income tax returns. She consulted him about her investments. The proponent and his sister were Mrs. Benson's "nearest" friends and she had confidence in them. Mrs. Benson kept a diary and many instances of helpful service by Miss Abbott are recorded in it. The contestant, aged fifty-two, once lived at the Reading Inn. He frequently visited Mrs. Benson while she was there. He was a heavy drinker and sometimes he was so drunk that Mrs. Benson was obliged to call upon the police to remove him. Numerous diary entries show that the contestant, while intoxicated, visited Mrs. Benson and she frequently sent him home. In many of the entries Mrs. Benson stated that these visits upset her. Having found the earlier instrument in which the contestant was the chief beneficiary, the proponent brought this to Mrs. Benson's attention and she disclaimed having made it and stated that she did not want the contestant to "have her property as he would drink it up."

One Fowler, who was in the real estate business in Reading and managed the inn property, at the proponent's request visited Mrs. Benson at the nursing home and asked her "what she wanted to do in the matter of a will." She repeated what she had said to the proponent about not knowing that she had made a will in the contestant's favor

and that she did not want him to have her property. Fowler asked her if she had a lawyer and she said her husband had had a lawyer named Rufus Sprague. Fowler told her that there was a lawyer in Reading named Sprague, and she said that she would see him. Fowler then got in touch with Lyman C. Sprague, an attorney in Reading, and suggested that he look up Rufus Sprague and find out if there was a will. Mr. Sprague did so and reported that Rufus Sprague had died and he was unable to locate any papers which might relate to Mrs. Benson. Upon learning that Mrs. Benson was under conservatorship, Mr. Sprague stated that he would do nothing about drawing a will for Mrs. Benson until he was assured by Dr. Baisley that she was competent to make one. After consulting Dr. Baisley, who informed him that Mrs. Benson was able to make a will, Mr. Sprague went to the nursing home with the proponent to confer with Mrs. Benson. After introducing Mr. Sprague to Mrs. Benson, the proponent left the room and Mr. Sprague talked to her alone. She discussed her relatives and the property left to her by her husband. She stated that she did not want the contestant to have her property "as he is a drinker." She instructed Mr. Sprague to draw a will giving a $500 bequest to a cousin, two bequests of $25 each to two employees at the inn, and the rest to Miss Abbott because "she was so good to me and faithful." Mr. Sprague prepared a will in accordance with these instructions and it was executed on the following day, January 1, 1955, in the presence of three witnesses, one of whom was Dr. Baisley. Before the instrument was executed Mr. Sprague saw Mrs. Benson alone and read it to her and she said it was what she wanted. Shortly thereafter Dr. Baisley arrived and questioned her about the will and she repeated what she had said to Mr. Sprague. Mr. Sprague had with him the purported will of 1953 in favor of the contestant and after the instrument now offered for probate had been executed she tore the earlier instrument in two. Dr. Baisley and the other attesting witnesses would testify that Mrs. Benson was of sound mind.

Mrs. Cotton, the proprietress of the nursing home where Mrs. Benson lived from June, 1954, until her death, would testify that Mrs Benson's condition, physical and mental, improved between June and January. She would further testify that the contestant came to the nursing home two or three times when he "showed signs of having been drinking" and took Mrs. Benson to ride. She returned from these rides very much disturbed and no further rides with him were permitted.

The petition for probate named as Mrs. Benson's heir at law and next of kin George W. Peck, a cousin residing in Rutland, Vermont.

The principles of law applicable to the subject of jury issues are so familiar that they need not be set forth at length. Briefly stated, there must be a genuine and doubtful question of fact supported by evidence of such substantial nature as to afford reasonable expectation of a result favorable to the moving party. *Boston Safe Deposit & Trust Co.* v. *Blaisdell,* 333 Mass. 51, 55–56, and cases cited. The scope of an appeal in such cases is similar to an appeal in equity with a report of the evidence. It is our duty to examine the statements of expected evidence and to decide the case in accordance with our own judgment, giving due weight to the decision of the judge. *Cook* v. *Mosher,* 243 Mass. 149, 152–153. *Boston Safe Deposit & Trust Co.* v. *Blaisdell,* 333 Mass. 51, 56.

Mrs. Benson had lived alone for many years and her closest relatives were cousins who lived in other States and of whom she saw little. There was, therefore, nothing unusual about the bequest of the bulk of her property to Miss Abbott, who over a considerable period of time had befriended her and had performed many services for her. It cannot be said that the contestant was the natural object of her bounty or one to whom she might reasonably be expected to leave her property. Doubtless they were at one time friendly but from proposed evidence (including the diary entries) it would appear to have been a peculiar sort of friendship and had evidently become very much attenuated during the last year or two prior to Mrs. Benson's death.

The expected evidence to the effect that she "had failed considerably," was hysterical, forgetful and did not "know what she was doing" was most general. As against this the proponent proposed to show that the will offered for probate was prepared by an experienced and reputable member of the bar who declined to act in the matter until he had been assured by Mrs. Benson's physician, Dr. Baisley, that she was competent to make a will. There is the further evidence of Mr. Sprague, summarized above, as to other precautions taken by him with respect to the preparation and execution of the will. There is also the fact that when he showed the earlier will to his client she tore it in two. The witnesses to the will did not observe anything about Mrs. Benson that would lead them to believe that she was incapable of making a will.

In the light of all the expected evidence in the case we are of opinion that there was no substantial evidence of lack of testamentary capacity at the time the will was executed. The framing of an issue on testamentary capacity was error.

We are likewise of opinion that the expected evidence did not justify the framing of an issue on the ground of fraud or undue influence on the part of the proponent and Miss Abbott or either of them. The guiding principles as to the factors to be considered in cases of fraud or undue influence have been duly set forth by Chief Justice Rugg in the leading case of *Neill* v. *Brackett*, 234 Mass. 367, and need not be restated. See *O'Brien* v. *Collins*, 315 Mass. 429, 437. The proposed evidence in the case hardly goes beyond showing that the proponent, who was Mrs. Benson's conservator, might have had an opportunity to exercise undue influence and the general statement that "he would not allow anyone to be near [Mrs. Benson]" unless he was there. We are of opinion that this evidence does not justify the framing of an issue on the ground of fraud or undue influence. See *Karp* v. *Bara*, 335 Mass. 681.

The order of the Probate Court is reversed.

*So ordered.*