JAMES E. O'BRIEN *vs.* WELLESLEY COLLEGE & others.

Middlesex.    March 5, 1963. — June 3, 1963.

Present: SPALDING, WHITTEMORE, KIRK, SPIEGEL, & REARDON, JJ.

*Will,* Validity.   *Unsound Mind.   Undue Influence.   Probate Court,* Parties, Appeal, Will contest, Fair trial.   *Evidence,* Hypothetical question, Judicial discretion.

Upon appeal from a decree of a Probate Court allowing a contested will, the record warranted conclusions that a prior will and codicil of the testatrix benefiting the contestants were "included in the record" even though such instruments were not marked as exhibits nor the signatures thereon authenticated, and that the hearing of the case had been conducted on the basis that the contestants had standing to contest, and there was no merit in a contention that they were not "aggrieved" parties entitled to appeal.   [168–169]

On appeal from a decree of a Probate Court with a report of material facts and a report of the evidence, this court will review the evidence, give due weight to the findings of the trial judge, which will not be reversed unless plainly wrong, find any additional facts justified, and decide the case in accordance with its own reasoning and understanding.   [170]

A finding by the judge in a contested will case that the testatrix, an elderly widow under conservatorship, "had the mental capacity to execute the will" was not plainly wrong on reported evidence, although evidence to the contrary was substantial, where it appeared that one who visited the testatrix to obtain information for drawing the will and who oversaw its execution testified that she conversed with him and gave him "without the use of memorandum, from memory" a list of names and addresses of persons she wanted to mention in the will and that she understood the will when it was executed, that the attesting witnesses testified that the testatrix was of sound mind, that a doctor who attended her testified that in the period when the will was executed she was "fairly rational at times," and that, in the month between its execution and her death she stated her wish not to embrace a particular religious faith.   [170–171]

In a contested will case involving the will of an elderly, infirm widow without close relatives and under conservatorship, where it appeared that the will bequeathed the bulk of her property to the proponent and his wife, friends with whom the testatrix had come to live five years before her death and who she stated "had been good to her," whereas an earlier will and codicil had substantially benefited the contestants, findings by the judge that the testatrix "clearly acted on her own free will" and that there was "no exercise of undue influence" by the proponent and his wife were not plainly wrong on reported evidence, particularly that the person

O'Brien *v.* Wellesley College.

who obtained the information from the testatrix for preparation of the contested will and oversaw its execution took great care to ascertain that she fully understood that will and that the disposition of her property made by it was what she desired.   [171–172]

At the trial of a petition for proof of a will contested on the ground that the testatrix lacked testamentary capacity, there was no abuse of discretion in the exclusion of a hypothetical question to an expert medical witness, who had not been a physician of the decedent, where it appeared that the witness "was not present during the entire trial" and that the question did not embrace all the pertinent facts.   [172–173]

The record of the hearing in a Probate Court in a proceeding for proof of a contested will did not support an allegation by the contestants that they were denied "a fair and impartial trial" by reason of caustic remarks by the judge and because he "constantly sought to elicit" testimony from various witnesses.   [173–174]

PETITION filed in the Probate Court for the county of Middlesex on November 16, 1960, for proof of the will of Flora L. Eaton, late of Arlington.

The case was heard by *Monahan, J.*

*Edmund L. Twomey* (*Robert W. Emmons* with him) for the contestants Wellesley College & others.

*Casper T. Dorfman* (*Joseph G. Crane* with him) for the proponent.

· *Harris I. Baseman, Charles E. Holly, John E. Rogerson & Philip R. White, Jr.,* for sundry contestants, joined in a brief.

SPIEGEL, J.   These are appeals from a decree of the Probate Court allowing an instrument dated September 22, 1960, as the will of Flora L. Eaton, late of Arlington.   After a full hearing the judge made a voluntary report of material facts.   The evidence is reported.

The judge concluded his report with the following: "1.   On all the credible and material evidence as to the execution of the will, I find that the will was properly executed in every respect.   2.   On the basis of all the material evidence which I consider credible, I find that not only was there no exercise of undue influence, but the precautions which the witness Jensen took were such as to lead me to conclude as a fact that the . . . [decedent], Mrs. Eaton, clearly acted on her own free will.   3.   Evidence was of-

fered by the contestants on the issue of testamentary capacity. To the Court, this presented serious questions of credibility. On the basis of the evidence which the Court considered credible, I find that on September 22, 1960, when the will was executed, Mrs. Eaton had the mental capacity to execute the will in question. In this connection it is only proper to consider the testimony of Dr. Kozol. He was produced by the contestants as an expert on the issue of testamentary capacity. He appeared as a so-called 'percipient witness' who testified that he had heard all the testimony of all the witnesses. I find that as a fact he was not present during the entire trial. I entered a decree allowing the will for probate, from which appeals were duly taken. No request for a report of material facts having been made, I herewith make this voluntary report of material facts.''

The transcript of evidence contains over 700 pages. In view of the report of material facts, hereinafter summarized, we see no point in outlining the voluminous testimony which we have carefully reviewed. The salient facts found by the judge, in addition to those hereinabove related, and culled from his report, are as follows.

The decedent, a widow, died on October 22, 1960, at the age of eighty-nine. She was the mother of two children who died in early childhood. She had a sister who predeceased her by ''some years'' and a brother, Benjamin Luther, by ''some 21 months.'' The only surviving blood relatives of the decedent are the three children of her sister's deceased son. There was no evidence that any of these children visited or communicated with the decedent from the time of her husband's death in 1928. The decedent was a well-educated woman who had attended Wellesley College but had not graduated therefrom.

From the time of her husband's death until November, 1955, she lived alone in various places except for two brief periods when she had stayed in nursing homes.

On February 11, 1930, the decedent established a living trust, the corpus of which consisted of a number of shares

of stock of General Mills, Inc.  The Boston Safe Deposit and Trust Company was named trustee.  This instrument was amended June 23, 1930, and again on September 24, 1945.  On January 26, 1933, the decedent executed a will in which the Boston Safe Deposit and Trust Company was named executor and trustee.

The will presented for probate was executed on September 22, 1960, and named the proponent, James E. O'Brien, as executor.  No relative of the decedent who would have been entitled to inherit in the event of intestacy appeared in opposition to the allowance of the will.

O'Brien was in the radio repair business when he first met the decedent in 1938.  He had repaired the decedent's radio and shortly thereafter he received a letter of thanks from her for his "patience and courtesy."  A friendship developed between the decedent and the O'Brien family. In September of 1938 she persuaded O'Brien to go to Venezuela because there were "opportunities" in South America.  She paid his expenses to New York, "saw him off" on a ship, and gave him a check for $500 "to help defray the expenses of the trip."

After O'Brien's return from South America their friendship continued.  In June of 1949 O'Brien was married to a woman whom the decedent had known for about five years. In June of 1954 the decedent was admitted to the New England Deaconess Hospital suffering from malnutrition.  The doctors found no other "evidence of abnormalities."  She was discharged on July 7, 1954, and returned to her apartment in Brookline under the continuing care of her doctor. "She was being given Thorazine and Serpasil drugs for nervousness."  Her doctor "called in a psychiatrist who recommended shock treatments."  These were refused by the decedent after consultation with another psychiatrist. No physician saw her from August 20, 1954, until September 23, 1954, when another physician, Dr. Dwight L. Siscoe, was called in by a trust officer of the Boston Safe Deposit and Trust Company.  At that time she was "still frightened and malnourished."  Her landlord was "urging her

to move." Dr. Siscoe continued prescribing drugs. At this time she was "oriented in time and place and to the persons around her." Dr. Siscoe attended the decedent until August 9, 1955. "On or about November 19, 1954, Dr. Siscoe was contacted by someone at the Boston Safe Deposit and Trust Company suggesting that he examine . . . [the decedent] for the purpose of having the bank appointed as conservator of her property. . . . Doctor Siscoe was presented with a medical certificate completely filled out for his signature." The decedent signed the petition for the bank to be appointed as her conservator. At that time she had the capacity to understand what she was doing. On November 29, 1954, the bank was appointed conservator. From her Brookline apartment the decedent went to nursing homes where she was visited every two or three days by O'Brien. Subsequently, the decedent told the officers of the bank she would like to live with O'Brien in a new house which the O'Briens were going to buy, because they "would take good care of her." She was able to discuss the matter of her home intelligently. She made her own decisions even though she was under conservatorship.

In October, 1955, the O'Briens purchased a house in Arlington and the following month the decedent moved in and occupied a second floor suite. She participated in the selection of "drapes" and curtains and requested the trust officer of the bank to have certain of her household effects, which had been placed in storage, sent to her in Arlington. She "had the run of the O'Brien house," and ate most of her meals with the O'Briens as a member of the family until some time late in 1958 when she was confined most of the time to her suite. The decedent received visits from various friends and relatives by marriage until shortly before her death. "She was able to make herself understood and she was oriented in time, place and to the persons around her until a few days before she died." In September, 1960, the decedent fell and injured her hip.

On September 19, 1960, in response to a telephone call to

the law office of Crane, Inker, and Oteri, a Mr. Richard H. Jensen, employed by the firm as an investigator and clerical assistant, was sent to the home of the decedent "for the purpose of obtaining information necessary to draft a will." Mr. Jensen was a law school graduate but was not a member of the bar at that time. Subsequently, however, he became a member of the Massachusetts bar. He had not met the decedent or the O'Briens prior to that date. Mr. Jensen was introduced to the decedent by O'Brien as "the man who was there to help her make her will." She told him that she would like to see the O'Briens receive "all her property as they had been good to her." She informed him that all her relatives were dead and she had no one who was really close to her. "[W]ithout the use of memorandum, from memory," she gave Mr. Jensen a list of names and addresses of persons she "wanted to mention in her will." Mr. Jensen informed the decedent that "the will would be prepared and that a member of the law firm would return to have it executed by her and three witnesses." At this time Mr. Jensen did not know that the decedent had an unrevoked, executed, purported will in the possession of the Boston Safe Deposit and Trust Company, executed in 1933, and modified by a codicil executed in 1945. "[Mr.] Jensen turned the notes he made of . . . [the decedent's] instructions over to one of the senior partners of the firm, for drafting the will and informed the partner of all the facts that he had learned including the fact that . . . [the decedent] was under conservatorship."

After the will was drawn, Mr. Jensen was directed to oversee the execution of it. On the evening of September 22, 1960, Mr. Jensen saw the decedent and told her that he would read the provisions of the will and if she wanted "changes to be made to so inform him." He read the draft of the will to her, paragraph by paragraph. The decedent did not hear some words and required Mr. Jensen to repeat what he had read. "After re-reading the clause or clauses . . . [the decedent] nodded her head . . . [in] agreement and . . . [said] 'Yes' or 'Uh, Uh.'" After he had com-

pleted the reading of the instrument the decedent assured him that was the way she wanted to leave her property. With the decedent's permission Mr. Jensen then asked the witnesses who were waiting downstairs to read the will. After all the witnesses read the will, he reread the will to the decedent in the presence of the witnesses and "at the end of each clause she signified her assent." After Mr. Jensen had "finished re-reading the will he inquired of her whether this was the will she wanted to make and she answered, 'yes it is.'" The decedent had difficulty holding the pen and "at her request [Mr.] Jensen steadied her hand as she wrote her name." She signed her name in the presence of Mr. Jensen and the three witnesses. She also "affixed her initials to . . . the bottom of each page." Mr. Jensen "did not guide the hand of the [decedent]." Mr. Jensen and the three witnesses "affixed their signatures to the will after she signed it."

Sometime subsequent to the execution of the will, the decedent "expressed a desire to see a priest." After a priest visited her, she informed her attending physician "that she told the priest that she did not wish to embrace the Catholic faith."

1. The petitioner (proponent) contends that this court has no jurisdiction to "entertain" this appeal because the contestants are not aggrieved persons. He argues that the prior will of the decedent executed in 1933 and the 1945 codicil are not "included in the record" and that "[i]t was incumbent on the . . . [respondents] at the trial to adduce evidence of the execution of the instrument by the person purporting to have executed it." "There is no question but that a will rightly may be contested by a legatee under a prior will who is given less or nothing under the instrument in question." *Best* v. *Burgess,* 319 Mass. 67, 69. At the inception of the hearing counsel for the respondents (contestants) stated to the judge that the decedent had executed a will in 1933 and a codicil to that will in 1945. The judge then asked "is there anyone objecting to the introduction of the original will made in 1943 [*sic*]" or the codicil made in 1945? Counsel for the respondents an-

swered that "[t]here is not." Shortly thereafter counsel for the petitioner said to the judge: "For the purposes of the record and in lieu of testimony, by agreement with . . . [counsel for the respondents] I am going to read in some of these facts which will be part of the record." In the course of this recital he stated: "January 26, 1933, is the date of the first will, with the Boston Safe Deposit and Trust Company as executor and trustee. . . . On December 27, 1945, a codicil to the will of January 26, 1933 was executed; and the last will was September 22, 1960." At a later point, counsel for the petitioner, referring to the same documents, remarked: "I am agreeing, your Honor, that he [attorney for the respondents] put in the trust, the amendments, and both will and codicil. I am perfectly willing for the Court to get all that information." At still another point, and without objection by the petitioner, counsel for the respondents stated to the judge: "The 1960 will, which we are contesting, after certain bequests of personal property, like silk scarves and an ashtray and rugs and things like that, and a bequest of a hundred dollars to Wellesley College, which had received one-quarter of the residue in the first will and codicil, leaves everything to Mr. and Mrs. James E. O'Brien of Arlington." The judge listed the earlier will and codicil in his report of material facts and, during the course of the trial, referred to the beneficiaries named in the first will and those named in the second. At no time, either before or during the trial, does the transcript show that the petitioner challenged the standing of the respondents to contest the second will. It is obvious from a reading of the transcript that the hearing was conducted on the assumption that the respondents had standing to contest as "aggrieved" parties. The record fully supports the respondents' position that the 1933 will and the 1945 codicil were "included in the record," even though these instruments were not marked as exhibits and the signatures thereon were not authenticated.

2. The respondents maintain that the petitioner "failed to sustain the burden of proving by a fair preponderance of the evidence that the . . . [decedent] possessed testamen-

tary capacity when she executed the will dated September 22, 1960." The judge found that on the day in question the decedent had sufficient testamentary capacity to execute the will. Where we have a full report of the evidence in addition to the judge's findings, "[i]t is our obligation to review the evidence and reach a decision in accordance with our own reasoning and understanding, giving due weight to the findings of the trial judge, which we will not reverse unless they are plainly wrong, and finding for ourselves any additional facts we believe to be justified by the evidence. *Berry* v. *Kyes,* 304 Mass. 56, 57–58. *Shattuck* v. *Wood Memorial Home, Inc.* 319 Mass. 444, 445. *Young* v. *Paquette,* 341 Mass. 67, 70. *Hanrihan* v. *Hanrihan,* 342 Mass. 559, 564." *Petition for Revocation of a Decree for Adoption of a Minor,* 345 Mass. 663, 669. Two doctors, who treated the decedent in 1954 and 1955, testified to her deteriorating mental capacity at that time. Neither doctor was a psychiatrist. There was also extensive testimony by various friends and acquaintances of the decedent as to her increasing inability to carry on a conversation as death approached. To the trial judge, this latter testimony "presented serious questions of credibility." Indeed, during the cross-examination of one of the respondents' female witnesses, the judge interjected: "I am surprised at some of the testimony of this witness." Later, during redirect examination of the same witness, the judge stated: "Before I make my decision, I will read this record. There are a great many inconsistencies in this"; to which counsel for the respondents answered, "I will not question that." The judge replied: "And in this woman." Aligned against this evidence was the testimony of Mr. Jensen that the decedent was able to converse with him, understood the document she was executing and, significantly, gave Mr. Jensen "without the use of memorandum, from memory" a list of names of persons she wanted to mention in her will "and their addresses." In addition, the attesting witnesses testified that the decedent was of sound mind. There was also the testimony of the doctor who attended her in her last

illness, a Dr. Brusch, a witness for the contestants. Describing the period immediately prior to her death, he stated: "About the last week or so she wasn't too good, but previous to that she was fairly rational at times, as much as she had been within the last few months previous to the accident." The contested will was executed exactly one month prior to her death. Finally, importance may be attached to her expressed "desire" to see a priest, her visit with a priest, and the fact that she later "informed Dr. Brusch that she told the priest that she did not wish to embrace the Catholic faith." All of this occurred subsequent to the execution of the will.

The evidence that the decedent lacked testamentary capacity was substantial, to be sure. However, there was sufficient evidence to the contrary to support the judge's finding. "Very likely a finding the other way would not have been disturbed." *Goddard* v. *Dupree,* 322 Mass. 247, 250. "The question is not what finding we ourselves would have made on the same evidence." *Ibid.* 248. The hearing lasted six days, during which time there was extensive direct and cross-examination of the witnesses, so that the judge was able to see and hear each of them at length and to reach a determination as to their credibility. See *Liberty Mut. Ins. Co.* v. *A. C. Martinelli Rogers Plastic Corp.* 344 Mass. 498, 502. We cannot say the judge was plainly wrong in concluding that the decedent "had the mental capacity to execute the will in question."

3. The respondents also contend that the execution of the will was obtained by the undue influence of the petitioner and his wife. "The contestants [respondents] have the burden of proving undue influence." *Viens* v. *Viens,* 302 Mass. 366, 367. *Tarricone* v. *Cummings,* 340 Mass. 758, 762. "The guiding principles as to the factors to be considered in cases of fraud or undue influence have been set forth by Chief Justice Rugg in the leading case of *Neill* v. *Brackett,* 234 Mass. 367, and need not be restated." *Abbott* v. *Noel,* 337 Mass. 133, 139. Although the respondents point to no specific act of undue influence on the part of the

O'Briens, they argue that "[a]ll the circumstances in this case," the infirm condition of the eighty-nine year old decedent, the relationship of trust and confidence between her and O'Brien, the "fact that she had no opportunity for independent advice," and the complete change between her earlier will and the will offered for probate, require a finding that the alleged will was obtained through the undue influence of the O'Briens. These factors, together with others cited by the respondents, may suggest that the decedent was susceptible to influence but they show neither "the fact of . . . improper influence exerted" nor "submission to the overmastering effect of such unlawful conduct." *Neill* v. *Brackett,* 234 Mass. 367, 370. There must be a solid foundation of established facts upon which to rest an inference of undue influence. "This proposition applies with peculiar force when the result of drawing such an inference is to destroy the effect of a written instrument prepared with deliberation and signed and attested with all the formalities required by law for the execution of a will." *Neill* v. *Brackett, supra,* 370. The judge could and apparently did rely in great measure upon what he described as the "precautions" taken by Mr. Jensen in his meetings with the decedent. Mr. Jensen's repeated inquiry of her as to whether there might be anyone else other than the O'Briens to whom she "would like to leave her property"; her recital to Mr. Jensen, from memory, of the names of eleven persons to whom she bequeathed various articles of personal property; and his reading and rereading of the document, paragraph by paragraph, to her until she indicated her assent to each provision; all of these support the judge's finding that she "clearly acted on her own free will." The judge was not in error in finding that there was "no exercise of undue influence."

4. Another contention of the respondents is that the exclusion of the testimony of Dr. Harry L. Kozol "constituted reversible error." The decedent was not a patient of Dr. Kozol. However, the doctor was present in the court room during the testimony of the other witnesses except for a

brief period when he was absent. In his report of material facts the judge stated that Dr. Kozol "appeared as a so-called 'percipient witness' " but "was not present during the entire trial." This may have been a reason for the judge's exclusion of the hypothetical question. In addition, however, the transcript shows that the judge was not satisfied with the scope of the question. At one point, he remarked to counsel for the respondents that "[t]here are more facts that you have not put in." The hypothetical question proposed to the expert witness, although lengthy, did not embrace other facts, which could have been found on the evidence presented and which, if stated, might well have led to a different conclusion. *Wellman* v. *Carter,* 286 Mass. 237, 243. The scope and fullness of hypothetical questions must be left to the discretion of the trial judge. *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 280. There was no abuse of discretion.

5. The final argument of the respondents is that they "did not have a fair and impartial trial." The respondents cite a number of remarks made by the judge which they describe as "unusual conduct." Undoubtedly, there were some exchanges between the judge and counsel for the respondents and, on occasion, between the judge and a witness, wherein the remarks of the judge may be described as caustic. Remarks of a similar nature, although not as frequent, were also directed to counsel for the petitioner. The judge was obviously troubled by the testimony of some of the witnesses. He even asserted his doubts as to their credibility in his report of material facts. It is also apparent that the judge was disturbed by certain events which occurred while the decedent's estate was under conservatorship. We note that a jury was not present who could have been unfairly influenced by any acerbic observation of the judge. The respondents also list a number of instances wherein the judge "constantly sought to elicit" testimony from various witnesses. It was said in *Pattee* v. *Stetson,* 170 Mass. 93, 94: "The Probate Court, in considering a petition for the allowance of a will, may well hear any one

who claims an interest, and who seems to be in a position to throw light upon the questions under consideration. It may in its discretion hear a person as amicus curiae, or seek information in any other proper way at the hearing.'' We do not believe that this discretion was abused or that the way selected was improper. Considering the judge's comments in the context in which they were uttered, and contemplating the record in its entirety, we are unable to say that the respondents were denied ''a fair and impartial trial.''

Costs and expenses of this appeal are to be allowed by the Probate Court to the petitioner and the respondents to be paid out of the estate of the decedent.

*Decree affirmed.*