Fabricant, J.
INTRODUCTION
This action arises from the death of Jane Naimey at age eighty-seven. The plaintiffs, three relatives of Naimey, allege that the defendants tortiously interfered with their expectation of receiving an inheritance from Naimey by exercising undue influence on her to dispose of her property in their favor. The plaintiffs also allege that two of the defendants negligently caused Naimey’s death by interfering with her compliance with medical instructions. Previous litigation between these parties regarding Naimey’s estate resulted in a judgment of the Probate and Family Court Department in favor of the plaintiffs in this action. The plaintiffs now move for partial summary judgment on these claims, relying primarily on the findings and orders entered by the Probate Court in that case. For the reasons that will be explained, the motion will be allowed in part and denied in part.
BACKGROUND
Jane Naimey was born on November 21, 1907, and died on June 13, 1994, having never married or had children and having outlived all of her five siblings. On October 3, 1986, Jane executed a will containing bequests to the plaintiffs. On September 20, 1991, Jane executed a will, trust, and other documents, which had the effect of eliminating her bequests to the plaintiffs and substituting transfers and bequests for the benefit of the defendants and members of their family.
After Naimey’s death, defendant Garabed Kayakachoian and James R. Willing, as co-executors under the 1991 will, petitioned the Probate Court to have that will admitted for probate. The plaintiffs and other relatives opposed the petition on the ground that the 1991 will was the product of fraud and undue influence exercised on Naimey by the defendants. The plaintiffs also filed a separate action in the Probate Court seeking to have the 1991 trust declared void on the same grounds. The two cases were consolidated and tried before Judge Robert Langlois of the Probate Court over the course of nine days between August and November of 1997. The evidence included the testimony of twenty-three witnesses, along with ninety-five exhibits. All the parties to this action were parties at trial before Judge Langlois and were represented by counsel.
On November 24, 1997, Judge Langlois issued findings of fact consisting of one hundred and twenty paragraphs spread over twenty-six pages. His findings with respect to issues of significance here include the following. Jane Naimey was “a very warm, trusting person who was easily influenced or swayed.” She “invariably did what others asked her to do” and “was very unsophisticated in, and naive about, financial matters and was not capable of effectively managing her financial affairs.” She did not drive, and was incapable of handling such matters as the use of an ATM machine, the renting of an apartment, and the like. For some fifty years prior to April of 1991, Jane had lived with her sister Mary in a. large house in Brighton. Jane depended heavily on Mary for the management of financial, household, and other affairs, and also had close relationships with the plaintiffs and other members of their extended family, with certain longtime friends, and with the pastor of her church. The house Jane and Mary shared contained numerous valuable furnishings and other items.
Mary Naimey died on April 28, 1991, leaving Jane “devastated,” and “invariably sad, very lonely, depressed and labile.” In the months following Mary’s death, various friends, relatives, and others with whom Jane had longstanding relationships sought to assist her in arranging to sell the Brighton house and to move to an assisted living or similar facility. With such assistance, the house was placed under contract for sale, at a price consistent with fair market value, and arrangements were made for Jane’s residence in a facility near her church, which had longbeen a focus of her life. As of Mary’s death, Jane was sole owner of the house and its contents, and also had “a significant number of Series E bonds” and “at least 17 bank accounts.”
In August of 1991, while still living in the Brighton home but scheduled to move, Jane received a visit from defendant Cecilia Kayakachoian and Cecilia’s sister, Elizabeth Huebel, both of whom had been “passing acquaintances” of Jane since the three had been co-workers decades earlier. The two sisters found Jane “upset at having to move and at the sale price.” Within a period of some six weeks after this meeting, Cecilia, Elizabeth, Cecilia’s husband Garabed, and their son Gary, assisted by lawyers with whom they had longstanding relationships and with whom Jane had no previous relationship, gained overall control of *31 all of Jane’s financial and personal affairs. Their control extended to all her communications and comings and goings, including her access to and interactions with other relatives and friends, her attorney and pastor.
As of September 20, 1991, Jane was living in the Kayakachoians’ home, and had executed a new will and trust prepared by their attorney, along with a power of attorney in favor of Cecilia. The documents named Garabed Kayakachoian and James Willing, an investment advisor with whom the Kayakachoians had a longstanding relationship but whom Jane had never met, as both co-executors of the will and co-trustees of the trust. The will provided for the sale of all Jane’s property, with the proceeds to pour over into the trust; the trust provided for distribution of relatively small amounts to Jane’s church and to certain named relatives, with the remainder to be divided between Cecilia and Elizabeth. In December of 1991, Jane executed an amendment to the trust, again prepared by the Kayakachoian’s attorney, eliminating the distributions to relatives; the result was that, other than a relatively small gift to her church, Jane’s entire estate would go to Cecilia and Elizabeth. At the times of her execution of each of these documents, Jane was competent but was not “aware of either the specific contents of either documents or the effect that said documents would have, upon her death on/over the ultimate disposition of her assets.” Jane paid fees to the attorney who prepared these documents in an amount that was excessive for the services provided.
In October 1991, after unsuccessful attempts to contact Jane, her relatives brought a petition for her guardianship. The Court appointed a guardian ad litem, who, after three discussions with Jane and an unsuccessful effort to view her room at the Kayakachoians’ home, reported to the Court his opinion that Jane was competent for purposes of the guardianship petition. Based on that report, the relatives abandoned the guardianship petition, without Jane ever having appeared in court. Jane’s information about the nature and purpose of the petition came from the Kayakachoians, who conveyed it to her in a manner calculated “for the purpose of emphasizing and reinforcing what they wanted Jane to believe her relatives were trying to do.” As a result, “Jane became very upset and embarrassed and, effectively, turned away from her family for the remaining few years of her life.” Thus, the Kayakachoians “effectively caused the termination of any relationship which Jane had, for decades, enjoyed with her family, her friends and her church.”
During the early months of 1992, the Kayachoians “assisted Jane in liquidating all of her accounts and placing said funds in the trust account managed by Gary” and the co-trustee. Cecilia became co-signatory on Jane’s personal bank account. Between September of 1991 and November of 1993, “at least $25,800 was withdrawn from Jane’s Brookline Savings Bank account for purposes which were neither of Jane’s choice nor for her benefit. Such withdrawals benefitted not Jane but the Kayakachoians principally Celia and Garabed.” Between December of 1993, when Jane was hospitalized, and her death in June of 1994, the Kayakachoians made additional withdrawals from Jane’s accounts, “solely for their benefit,” totaling $8,900. Cecilia and Elizabeth also removed and “either kept or sold” Jane’s furniture and household effects of value. Garabed took Jane to the Suffolk Downs race track “on several occasions . . . and it is more likely than not that Jane’s money was used on such occasions.”
Jane continued to live in the Kayakachoians’ home until December of 1993. The Kayakachoians provided for her day-to-day physical needs during this time. Throughout the time Jane lived with them, the Kayakachoians controlled her communications with others and her comings and goings. From August of 1991 forward, they never took her to the church she had attended for decades, even on the occasion of an observance of the six-month anniversary of the death of her sister Mary. Nor did they take Jane to any of the observances of the September 1992 death of Alma George, a relative with whom she had been particularly close throughout her life. This latter failure was “intentional. . . with the purpose of continuing to keep Jane away from members of her family.” From August 1991 through the remainder of Jane’s life, the Kayakachoians “went to great efforts to limit inhibit, impede! 1 and discourage any contact between Jane, and her relatives, her pastor, her friends and/or her church.”
Jane was admitted to St. Elizabeth’s Hospital in early December 1993. On December 24, 1993, she was declared incompetent. She remained at St. Elizabeth’s until March of 1994, when she was transferred to Youville Hospital, where she remained until her death on June 13, 1994. On various occasions during Jane’s hospitalization, Cecilia employed her power of attorney to direct the entry of a “do not resuscitate” order in Jane’s hospital chart. The Kayakachoians did not notify any of Jane’s relatives of her death. On July 14, 1994, Garabed Kayakachoian and James Willing petitioned for probate of the September 20, 1991 will, listing two of the present plaintiffs as Jane’s heirs at law.
Based on these findings of fact, the Probate Court ruled that the 1991 will and trust were the product of fraud and undue influence. Accordingly, that Court entered judgment denying the petition for probate of the 1991 will and voiding the trust. The judgment also ordered the defendants to turn over any assets in their possession belonging to Jane, and to reimburse her estate for the amounts found to have been converted. The record before this Court discloses no appeal from that judgment.
*32 On December 3, 1997, the Probate Court allowed plaintiff Hadayia’s petition for probate of the 1986 will, and appointed her administratrix. Hadayia then filed a petition for instructions, seeking the Probate Court’s approval of her payment from the estate of attorneys fees and litigation costs for the will contest, in the total amount of $359,933.67, pursuant to a contingent fee agreement she had entered into in 1994. By order dated June 2, 1998, Judge Langlois allowed the petition for instructions, finding the attorneys fees and costs under the contingent fee agreement to be “fair and reasonable,” and approving their payment. The record presented on the present motion provides no further information as to the proceedings relating to this order; in particular, it does not indicate whether the Kayakachoians were entitled to, or received, notice of the petition for instructions, whether they had an opportunity to or did take any position on the reasonableness of the amount, or whether any hearing was held.
The plaintiffs base their motion for summary judgment as to the tortious interference claim on the facts set forth thus far, relying on the findings of the Probate Court for the factual elements of liability and on that Court’s approval of their attorneys fees to establish their damages. The defendants, in opposition, offer the following additional factual material with respect to the tortious interference claim and the issue of damages on that claim. The plaintiffs have settled claims against Elizabeth Huebel and her daughter Adele Huebel for payment of $25,000, and against the attorney who prepared the 1991 will and related documents for payment of $110,000; the proceeds of these settlements have been paid to Jane’s estate. In addition, the defendants offer the affidavit of Gary Kayakachoian, who recites his training and experience in finance. Gary states that beginning in January of 1992 Jane’s assets were invested in Prudential Securities accounts, with investment decisions made “as a result of consultations between myself and James Willing.” Prudential Securities records show net growth in Jane’s accounts by some $311,899.28 between January of 1992 and 1997. Gary opines that, if not for an October 1994 court order preventing further investment of estate assets after that date, the accounts “would have had a value of at least $1.2 million by 1997,” an amount exceeding its actual value as of the end of 1997 by some half a million dollars.
With respect to the wrongful death claim, the record presents the following factual material, in addition to the Probate Court findings. Medical records reflect that Jane was first diagnosed with “mild congestive heart failure” on November 4, 1993. The cause of Jane’s death, according to her death certificate, was congestive heart failure. Jane’s sister Mary had died of the same disease in 1991. Dr. John Bolzan, who treated Jane between the fall of 1991 and early 1994, testified at his deposition that on December 6, 1993, he noted in Jane’s hospital chart that Jane “has not been compliant” with her treatment, and had elevated sodium. The evidence does not indicate in what respect or to what degree Jane had been noncompliant, or how Dr. Bolzan came to that conclusion. Asked whether her noncompliance “would have any bearing on the condition that she was in ... on 12/6/93,” Dr. Bolzan opined that “It certainly is contributing.” In his trial testimony in the Probate Court, Dr. Bolzan was asked “if Jane had not been compliant in taking her Lasix or been on a sodium diet, would that have contributed to her congestive heart failure on 12/9/93.” He responded “that would be contributory to congestive heart failure.” Jane’s condition upon her transfer from St. Elizabeth’s Hospital, according to Dr. Bolzan, was “stable, being weaned off vent.”
In her deposition conducted in the Probate Court proceeding, Cecilia Kayakachoian testified that while Jane lived with the Kayakachoians Cecilia “left it up to her to make sure that she took her medication as prescribed.” Asked “did you feel that you had an obligation to make sure she was well cared for,” Cecilia responded “of course.” Asked “who was responsible for feeding her while she was living with you,” Cecilia responded that “I did the cooking, and she would help me.” Although she denied that Jane was ever put on a low salt diet, Cecilia added that “I don’t use salt because of my own condition.”
DISCUSSION
This Court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56 (c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the nonmoving party must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). The nonmoving party cannot defeat the motion by resting on his or her pleadings and mere assertions of disputed facts, but must offer admissible evidence which, if credited by the factfinder, would be sufficient to support a finding in that party’s favor. LaLonde v. Eissner, 405 Mass. 207, 209 (1989).
I. TORTIOUS INTERFERENCE.
To establish liability on their claim that the defendants tortiously interfered with their expectation of receiving an inheritance from Jane Naimey, the plaintiffs must prove three elements: that they had a legally protected interest; that the defendants intentionally interfered with the plaintiffs’ expectancy in an unlawful way, such as by duress, fraud or undue influence; *33 and that the defendants’ interference acted continuously on the donor until the time the expectancy would have been realized. Labonte v. Giordano, 426 Mass. 319, 320-21 (1997). The facts found by the Probate Court, as summarized above, clearly include each of these elements; that Court found that the plaintiffs were Jane’s relatives and beneficiaries of her 1986 will, that the defendants caused Jane to change her will by fraud and undue influence, and that the defendants exercised extensive control over Jane from September of 1991 until her death. Thus, if the Probate Court’s findings in the previous litigation bind the defendants in this action, the plaintiffs motion must be allowed, at least as to liability on this claim.
Under the doctrine of collateral estoppel, or issue preclusion, a party is precluded from relitigating a fact previously adjudicated if: the party against whom estoppel is asserted was a party (or in privity with a party) to the prior proceedings; the prior proceeding resulted in a final judgment on the merits; and the issues in the prior proceedings were identical to those in the present case, or the fact adjudicated was essential to the earlier judgment. See Bannister v. Commonwealth, 411 Mass. 130, 131 (1991); Massachusetts Prop. Ins. Underwriting Ass’n v. Norrington, 395 Mass. 751, 753 (1985). Here, there is no question that all parties in this action were parties in the Probate Court proceeding at least throughout the will contest, and that the proceeding resulted in a final judgment.
It is beyond reasonable argument that the issues that were essential to the outcome of that proceeding included at least the first two of the elements of the present claim. In order to prevail in the will contest, the contestants were required to show first that they had standing to bring the action, in that the 1991 instruments affected their interests under the earlier will. See Wellman v. Carter, 286 Mass. 237, 250 (1934). Second, the plaintiffs were required to show that those instruments were the product of either fraud or undue influence, “in the one case the testator proceeding of his own free will but affected by a false representation of a fact which is the inducement for the disposition in question, and in the other, the testator’s own will and free agency being destroyed so that what he does he is constrained to do contrary to his own free will.” Rood v. Newberg, 48 Mass.App.Ct. 185, 191-92 (1999), quoting Wellman v. Carter, 286 Mass. at 254.
There is somewhat more room for argument on the third element, that of continuous interference. The authorities cited by the parties, as well as those identified by the Court, do not expressly identify continuity as a requirement for invalidating a will on the ground of undue influence or fraud. Nevertheless, such a requirement appears at least implicit in nature of the proceeding, which has as its underlying purpose to protect the free will of the testator. If the testator has voluntarily declined to alter or revoke an instrument, even after the improper influence that procured it has terminated, such conduct suggests that the instrument conforms to the testator’s will, and should take effect. Put differently, an instrument that is voidable as having been procured by fraud or undue influence might nevertheless lose that character through the testator’s voluntary conduct after the impropriety ends. A court’s decision to invalidate an instrument thus at least implicitly reflects a determination that at the time the instrument would take effect — that is, in the case of a will, at the time of death — the instrument remained the product of the improper influence that gave rise to its execution.
Here, Judge Langlois expressly and unequivocally found continuity as a factual matter. After hearing extensive evidence on the issue, he found that the Kayakachoians maintained extensive control of Jane, including her communications with others, from the initiation of their involvement in August of 1991 through the end of her life. That control continued even during Jane’s six-month hospitalization, through Cecilia’s power of attorney, as well as through the destruction of Jane’s other relationships that had already been accomplished. The centrality of these findings to the outcome of the Probate Court litigation is plainly apparent on review of Judge Langlois’ memorandum. Accordingly, this Court concludes that the defendants are bound by those findings and are precluded from any attempt to relitigate them in this action. See generally, Morganelli v. The Bldg. Inspector of Canton, 7 Mass.App.Ct. 475, 480 (1979). It follows that plaintiffs are entitled to judgment as a matter of law as to liability on their claim of tortious interference with their expectation of receiving an inheritance from Jane Naimey.
The issue of damages for that claim remains. As a result of the judgment in the will contest, the plaintiffs have in fact received, or upon final settlement of the estate, will receive, the inheritance provided for them under Jane’s 1986 will. In order to achieve that outcome, however, the plaintiffs had to undertake the burden of litigation in the Probate Court, at a cost to the estate of $359,933.67 for attorneys fees and litigation expenses. The plaintiffs now seek to recover this amount as their damages, relying on the Probate Court’s finding of fact as to its reasonableness, and on M.F. Roach Co. v. Town of Provincetown, 355 Mass. 732 (1969) as authority.
As the defendants argue, American common law generally bars recovery of attorneys fees as damages, absent statutory provision for such an award. In M.F. Roach Co. v. Town of Provincetown, the Court recognized an exception in cases of tortious interference “requiring the victim of the tort to sue or defend against a third party in order to protect his rights.” Although that case involved a claim of tortious interference with contract, rather than with expectation of inheritance, the rationale for the exception appears equally applicable here.
*34 The amount to be recovered presents a separate issue. The plaintiffs contend that the Probate Court’s order approving payment under the contingent fee agreement establishes, as a factual matter binding on the defendants, that the plaintiffs reasonably incurred fees in that amount. The record, however, does not provide the necessary basis for holding the defendants bound by this aspect of the Probate Court’s adjudication. As noted supra, the record leaves uncertainty as to the procedures leading to the Court’s approval, particularly as to whether these defendants had notice or an opportunity to be heard on the issue. At the time of the petition for instructions, the will contest had already been decided against the defendants. Under the decision that had already issued, the defendants no longer had any interest in the estate. Thus, they may not even have had standing to contest the amount of the attorneys fees to be paid from it. Under these circumstances, on the record presented, the defendants cannot be held bound by the Probate Court’s order authorizing the administratrix to pay attorneys fees for the will contest. As the record presents no other theory as to the absence of a genuine dispute of material fact on the amount of the plaintiffs’ damages, the issue of damages for the tortious interference claim remains to be tried.
Defendants raise two additional contentions regarding damages that warrant comment, although neither can be finally resolved at this stage. First, defendants argue that the plaintiffs’ damages must be reduced by amounts the estate has collected in settlement of claims against other parties, as noted supra. Plaintiffs make no direct response to this contention. To the extent that the present record identifies the nature of the claims that were the subject of those settlements, the damages appear to be the same as those in issue here, so that the defendants’ contention appears to be correct.
Second, the defendants contend that the plaintiffs have suffered no damages because their intervention in Jane Naimey’s management of her finances caused her estate to increase by an amount greater than any claimed damages the plaintiffs have incurred. They point out that before their involvement, Jane kept her funds in bank accounts earning minimal interest, while thereafter, upon advice of Gary Kayachakacho-ian, her assets were invested at a much greater return. Difficulties with this theory are immediately apparent. Any effort to determine how Jane’s assets would have been managed during the period of time in issue, absent the defendants’ role, is entirely speculative. However her assets may have been handled during her sister’s life, the facts as found by the Probate Court strongly suggest that, if the defendants had not disrupted her other relationships as the Probate Court found they did, Jane’s relatives and friends would have assisted her in obtaining appropriate professional assistance to manage her affairs prudently after her sister’s death. Further, no reason appears that Gary could not or would not have provided the same financial advice to Jane absent the defendants’ tortious conduct, so that her estate would have increased as it did, without incurring the damages claimed.
II. WRONGFUL DEATH.
To establish liability on their claim for wrongful death, the plaintiffs must prove the elements of duty, negligence, and causation. They contend that they have done so, beyond any genuine dispute of material fact, based on the findings of the Probate Court, considered together with the deposition testimony of Cecilia Kayakachoian and of Dr. Bolzan, along with Jane Naimey’s death certificate. Their theory, in substance, is that the Kayachoians had a duty to care for Jane arising from their exercise of control over her, as found by the Probate Court; that their breach of that duty is established by Dr. Bolzan’s notation that Jane was “noncompliant” with instructions regarding her medication and diet, and that causation is established by Dr. Bolzan’s opinion that such noncompliance would “contribute” to her condition as of the time of her hospital admission, together with the fact that her diagnosis upon admission was the same condition as that noted on her death certificate as the cause of her death.
The theory breaks down at each stage. The Probate Court did indeed find that the defendants exercised control over Jane, and that finding was essential to the judgment in that case insofar as it underlay the ultimate finding of undue influence. But the type of control that the Probate Court addressed involved decisions as to financial and logistical matters, and communications with persons outside the Kayakacho-ian family and their circle of friends and agents. The Probate Court made no findings, and had no occasion to make findings, as to the extent to which Jane was able to or did make her own choices of whether to take her medication or not, what to eat, whether to salt her food, and the like. Cecilia Kayakachoian’s deposition testimony, to the extent that it addresses these questions at all, indicates that Jane took responsibility for her own medication, and was offered food without salt.
Moreover, Dr. Bolzan’s opinion, as expressed at his deposition, falls well short of the necessary showing on causation; that Jane’s noncompliance, even if attributable to Cecilia, may have contributed to her condition at the time of her hospital admission hardly establishes that it was the proximate cause of her death. The fact that her diagnosis on admission was the same disease that caused her death is of little significance without expert testimony that full compliance with instructions as to medication and diet more likely than not would have cured the disease or lengthened its course to some significant extent. The plaintiffs offer no such evidence. Accordingly, the plaintiffs have failed to establish the absence of a dispute of material fact on the wrongful death claim, and their motion must be denied as to that claim.
*35 CONCLUSION AND ORDER
For the foregoing reasons, the Plaintiffs’ Motion For Summary Judgment is ALLOWED with respect to liability only on those counts of the complaint that claim tortious interference with an expectation of inheritance, and is otherwise DENIED.